

**ORDERED in the Southern District of Florida on October 31, 2017.**

_A. Jay Cristol_

**A. Jay Cristol, Judge**
**United States Bankruptcy Court**

---

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division
www.flsb.uscourts.gov

In re:

| | |
|---|---|
| NASSAU DEVELOPMENT | Case No. 15-27691-AJC-BKC |
| OF VILLAGE WEST CORP., | Chapter 11 |
| a Florida Corporation | |
|         Debtor. | |

_____/

In re:

| | |
|---|---|
| GRAND ABBACO DEVELOPMENT | Case No. 16-14286-AJC-BKC |
| OF VILLAGE WEST CORP., | Chapter 11 |
| a Florida Corporation | |
|         Debtor. | |

_____/

**ORDER (I) APPROVING PURCHASE AND SALE AGREEMENT AND**
**AUTHORIZING THE SALE OF THE DEBTORS' REAL AND PERSONAL**
**PROPERTY; (II) AUTHORIZING THE SALE FREE AND CLEAR OF LIENS,**
**CLAIMS, ENCUMBRANCES AND INTERESTS; AND**
**(III) GRANTING OTHER RELATED RELIEF**

**(The Clerk of Court is directed to enter a copy of this Order**
**in both Case No. 15-27691-BKC-AJC and Case No. 16-14286-BKC-AJC)**

1

**THIS CAUSE** came before the Court for final hearing on October 13, 2017 at 2:00 p.m. (the *"Sale Hearing"*) upon Drew M. Dillworth's (the *"Trustee"*), as Chapter 11 Trustee for Nassau Development of Village West Corp. and Grand Abbaco Development of Village West Corp. (the *"Debtors"*), Amended Motion for Entry of Order (I) Approving Competitive Bidding and Sale Procedures; (II) Approving Form and Manner of Notices; (III) Approving Purchase and Sale Agreement with Stalking Horse Bidder; (IV) Scheduling Dates to Conduct Auction and Hearing to Consider Final Approval of Sale, Including Treatment of Executory Contracts and Unexpired Leases; (V) Authorizing Sale of Substantially All the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; and (VI) Granting Related Relief (the "*Sale Procedures Motion*") [ECF No. 160 in Nassau case and ECF No. 142 in Grand Abbaco case].[1] The Sale Hearing was scheduled pursuant to the Court's Order Granting the Trustee's Amended Motion for Entry of Order (I) Approving Competitive Bidding and Sale Procedures; (II) Approving Form and Manner of Notices; (III) Approving Purchase and Sale Agreement with Stalking Horse Bidder; (IV) Scheduling Dates to Conduct Auction and Hearing to Consider Final Approval of Sale, Including Treatment of Executory Contracts and Unexpired Leases; (V) Authorizing Sale of Substantially All the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; and (VI) Granting Related Relief (the *"Sale Procedures Order"*)[ECF No. 169 in Nassau case and ECF No. No 158 in Grand Abbaco case].

By way of the Sale Procedures Motion and the Sale Procedures Order, the Trustee requested that the Court enter an Order (i) approving the form of the Purchase and Sale Agreement between the Trustee and GV Nassau LLC (the *"Stalking Horse Bidder"*), a true and

---

[1] Defined terms used herein but not otherwise defined shall have the meaning ascribed to such terms in the Sale Procedures Motion.

correct copy of which was attached as an Exhibit to the Sale Procedures Motion, authorizing the sale (the *"Sale"*) of the Assets (as defined herein); (ii) authorizing the Sale of the Assets free and clear of all liens, claims, encumbrances, and interests, as more fully set forth in this Order; and (iii) granting related relief.

Pursuant to the Sale Procedures Order, the Trustee conducted an auction (the *"Auction"*) of the Assets on October 13, 2017, at 10:00 a.m. (the *"Auction Date"*).    In accordance with the terms and conditions of the Sale Procedures Order, the Trustee solicited interested bidders and determined that four bidders were Qualified Bidders (as defined in the Sale Procedures Order).[2]  The Qualified Bidders were identified as the Stalking Horse Bidder, TC Grove Investments, LLC (*"TC Grove Investments"*), Crunch Properties, LLC (*"Crunch Properties"*) and B and B Grove Properties LLC (*"B and B Grove Properties"*).

B and B Grove Properties and TC Grove Investments each placed initial bulk bids on the aggregate portfolio of the Nassau Assets and the Abbaco Assets, while the Stalking Horse Bidder and Crunch Properties each placed separate bids on the Nassau Assets and Abbaco Assets. Prior to the commencement of the Auction, the Trustee augmented the auction procedures as permitted pursuant to the Sale Procedures Motion and Sales Procedures Order (*"Auction Rules"*) and each Qualified Bidder affirmed its consent to the Auction Rules. The Auction Rules included, but were not limited to, the Trustee's disclosure to the Qualified Bidders that after each bid submitted by Crunch Properties he would perform an analysis, and would announce the economics of the Crunch Properties bid, and would advise the other Qualified Bidders what each

---

[2] Orlando Benitez, Jr., attended the Auction as a Qualified Bidder through his assignee/designee Crunch Properties LLC, pursuant to this Court's Order Granting Trustee's Motion to Approve Settlement with Orlando Benitez, Jr., and DD&C Financial Investments Corporation, and to Approve Credit Bid (the *"Benitez Order"*)[ECF No. 182].

would need to do to beat the Crunch Properties bid. The Auction was conducted on the Auction Date by the Trustee in this Court, and a court reporter was present at the Auction and made a record of the proceedings. The only entities that participated in the Auction were TC Grove Investments, Crunch Properties and B and B Grove Properties, as the Stalking Horse Bidder did not place any competing bids during the Auction.

At the Auction, in accordance with the terms of the Sale Procedures Order, Bidding Procedures, and Auction Rules, as amended by the Trustee which amendments the Trustee announced to all Qualified Bidders, **B and B Grove Properties** submitted the highest monetary bid for the Nassau Assets and Abbaco Assets in bulk in an amount of **$5,400,000** ("***Purchase Price***") to be allocated among the Assets in the bankruptcy estates as set forth in the Sales Procedures Order, Bidding Procedures, Auction Rules and this Order as described and augmented by the Trustee.

For the reasons stated on the record, which are incorporated here by reference, the Trustee recommended that the purchase bid submitted by Crunch Properties in the amount of $3,395,000.00 for the Nassau Assets be approved as the highest and best bid for the Nassau Assets (the "***Crunch Nassau Bid***") and that the purchase bid submitted by TC Grove Investments in the amount $1,950,000.00 for the Abbaco Assets be approved as the highest and best bid for the Abbaco Assets (the "***TC Abbaco Bid***"). The Court, however, rejects the Trustee's recommendation that the separate Nassau Crunch Bid and TC Abbaco Bid represent the highest and best offer for the Assets and instead finds the Purchase Price submitted by B and B Grove Properties for all of the Assets as the highest and best bid. The Court also found that (i) Crunch Properties was the Back-Up Bidder for the Nassau Assets pursuant to the Crunch Nassau Bid, and (ii) TC Grove Investments was the Back-Up Bidder for the Abbaco Assets pursuant to the

TC Abbaco Bid. Crunch Properties and TC Grove Investments are sometimes collectively referred to herein as the "***Back-Up Bidders***." At the conclusion of the Sale Hearing, TC Grove Investments sought the entry of a stay pending appeal of the Court's sale ruling. The Court stated it would grant a stay on the express condition that the appellant party post a bond equal to 115% of the Purchase Price.

On October 18, 2017, the Bankruptcy Court considered and entered an Order Denying Motion for Reconsideration [ECF No. 189 in Nassau case and ECF No. 180 in Grand Abbaco case] in which TC Grove Investments and certain creditors sought Reconsideration or Rehearing of the Sale of Property of the Estate, or in Alternative for Reduction of Bond as Condition to Entry of Stay Pending Appeal [ECF No. 186 in Nassau case and ECF No. 177 in Grand Abbaco case]. In the respective Orders Denying Motion for Reconsideration, the Court confirmed its determination that the bid of $5,400,000.00 by B and B Grove Properties was the highest and best bid for the Assets at the Auction.

In addition, at the Auction, as required by the Title Company, Orlando Benitez, Jr. (***"Mr. Benitez"***), agreed to use his best efforts to obtain a corrective deed to cure what the Trustee described broadly to the Court prior to the commencement of the Auction as a "wild deed" as to the lot located at 3441 Grand Avenue from his mother, Rosa Benitez (the "***Benitez Deed***").

The Court has read and considered the Sale Procedures Motion, the Sale Procedures Order, the Auction Rules announced in Court and consented to by the Qualified Bidders, and the proposed Purchase Agreement presented by B and B Grove Properties (as amended after discussions with the Trustee and his counsel). It heard argument of counsel for the Trustee, B and B Grove Properties, Crunch Properties, and TC Grove Investments. The Court received a proffer on the record at the Sale Hearing from the Trustee, which proffer the Court has accepted

as testimony of the Trustee (to which the Court offered all parties in interest an opportunity to object to such proffer and/or to cross-examine the Trustee on such proffer and no parties in interest elected to do so), and it has considered the statements of counsel for the Qualified Bidders on the record at the Sale and at the Auction, and obtained a proffer on the record after the conclusion of the Auction regarding the "good faith" and other matters relevant to the Court from counsel for B and B Grove Properties and counsel for the two Back-Up Bidders, which proffers the Court has accepted as testimony of B and B Grove Properties and such Back-Up Bidders, as the case may be (to which the Court offered all parties in interest an opportunity to object to such proffers and/or to cross-examine such counsel on such proffers and no parties in interest elected to do so). The Court noted no objections to the Sale or the Purchase Agreement were filed prior to the Auction per the Sales Procedures Order, and has considered all other matters of record in the instant case, including the Motion for Reconsideration or Rehearing of the Sale of Property of the Estate which was denied as noted above. After due deliberation, the Court has determined, for the reasons stated on the record at the Sale Hearing, that the Purchase Price obtained at the Auction Sale is the highest and best bid for the Assets, and that good and sufficient cause has been shown in support of the relief requested in the Sale Procedures Motion. Accordingly,

**IT IS FOUND AND DETERMINED THAT:**

A.    **Jurisdiction and Venue**.  The Court has jurisdiction to hear and determine the Sale Procedures Motion and all related matters pursuant to 28 U.S.C. §§ 157 and 1334. The Sale Procedures Motion and all related matters are "core" proceedings within the meaning of 28 U.S.C. § 157(b).  The Court has full power and authority to enter a final order on the Sale

Procedures Motion and all matters herein.  Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.     **Statutory Predicates**.  The statutory predicates for the relief herein are sections 105, 363 and 365 of title 11 of the United States Code (the ***"Bankruptcy Code"***), as supplemented by rules 2002, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the ***"Bankruptcy Rules"***) and rule 6004-1 of the Local Rules of the Court.

C.     **Findings and Conclusions**.  The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

D.     **Certain Definitions**.  Each of the following definitions shall have the following meaning when used in this Order:

(i)     The term "**Abbaco Assets**" shall mean the collective reference to (a) the Abbaco Real Property and (b) all personal property owned by the applicable Debtor and used in the operation of the Abbaco Real Property.

(ii)     "**Abbaco Real Property**" means the real property described on ***Schedule 1.2*** attached hereto.

(iii)     The term "**Assets**" means the collective reference to the Abbaco Assets and the Nassau Assets.

(iv)     The  term "**Closing**" means the closing of the Sale of the Assets under the Purchase Agreement and the consummation of the Transactions under the Purchase Agreement.

(v)      The term "**Closing Date**" means the date of the Closing under the Purchase Agreement.

(vi)      The term "**Liens and Encumbrances**" means the collective reference to any and all liens (including without limitation any tax liens, equitable liens, judgment liens, utility liens, special master orders and liens, resort tax fees and liens and permit fees and liens), claims (including without limitation as defined in section 105(a) of the Bankruptcy Code), interests (including without limitation within the  meaning of section 363(f) of the Bankruptcy Code), encumbrances, rights of setoff or recoupment, rights of possession, memoranda of lease, pledge, covenants, restrictions, security interests, mortgages or lis pendens, contracts, options or other rights to acquire any interest in the Property, and other liabilities, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, disputed or undisputed, or known or unknown, whether arising before or after the commencement of the instant bankruptcy case, whether imposed by agreement, understanding, law, equity or otherwise, but does not include any easements, covenants, conditions or restrictions of record, including, without limitation, each of the liens, judgments, lis pendens and other liens and encumbrances listed on **Exhibit B** attached hereto (such matters listed on **Exhibit B** are collectively referred to as the "***Listed Liens and Encumbrances***").

(vii)      The term "**Nassau Assets**" shall mean the collective reference to (a) the Nassau Real Property and (b) all personal property owned by the applicable Debtor and used in the operation of the Nassau Real Property.

(viii)      The term "**Nassau Real Property**" shall mean the real property described on **Schedule 1.1** attached hereto.

(ix)     The term **"Permitted Exceptions"** means liens for taxes and assessments not yet due or payable; any law, ordinance or government regulations that apply to the Assets; any Covenants, Restrictions and Easements that are of record prior to the Effective Date; any rights of parties to any third party contract that B and B Grove Properties shall assume at Closing, to the extent such rights are title encumbrances; any matters of record prior to the Effective Date (as defined in the Purchase Agreement); any matters of record subsequent to the Effective Date approved in writing by B and B Grove Properties; exceptions or conditions to title identified by any title commitment obtained by B and B Grove Properties; matters that would be disclosed by a current survey of the real property comprising the Assets; and municipal or county liens for code violations and open permits; provided however, Permitted Exceptions shall not include any (i) liens intended to secure monetary indebtedness for items such as mortgage liens, tax liens, judgment liens, mechanic's or materialmen liens; or (ii) lis pendens or any other matters relating to lien claims; or (iii) tax sale certificates of record or (iv) any of the Listed Liens and Encumbrances.

(x)     The term **"Purchase Agreement"** means that certain Asset Purchase Agreement by and between the Trustee for each Debtor and B and B Grove Properties, in the form attached hereto as **Exhibit A,** as amended by Trustee and B and B Grove Properties in accordance with the terms of such Purchase Agreement and this Order.  With respect to the Back-Up Bidders, Purchase Agreement means those certain Asset Purchase Agreements by and between the Trustee for each Debtor and the respective Back-Up Bidder, in the form to be filed by the Trustee and the respective Back-Up Bidder with this Court, as amended by Trustee and each such Back-Up Bidder in accordance with the terms of such Purchase Agreement and this Order.

(xi)    The term **"Title Company"** means Fidelity Title Insurance Company, First American Title Insurance Company or such other national title insurance company acceptable to B and B Grove Properties or, if applicable, any Backup Bidder.

E.    **Notice.** As shown by the certificates of service filed with the Court and the representations or proffers made on the record, proper, timely, adequate, due and sufficient notice of the Sale Procedures Motion, the Sale Procedures Order, the Auction, the Sale Hearing, and the Sale has been provided, in accordance with section 363 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 9007, Local Rule 6004-1, the procedural due process requirements of the United States Constitution, and the Sale Procedures Order, to all persons and entities entitled to such notice, including, without limitation: (i) all entities who have claimed any Liens and Encumbrances upon the Assets; (ii) all governmental taxing authorities; (iii) all parties who filed requests for notices under Bankruptcy Rule 9010(b) or were entitled to notice under Bankruptcy Rules 2002 or 6004; (iv) all creditors of the Debtors; and (v) the Office of the United States Trustee (collectively, **"Interested Parties"**).  No other or further notice of the relief granted herein, including, without limitation, with respect to the Sale Procedures Motion, the Sale Procedures Order, the Auction, the Sale Hearing or the Sale, is necessary or shall be required.

F.    **Opportunity to Object.**    A reasonable opportunity to object or be heard regarding the relief requested in the Sale Procedures Motion has been afforded to all Interested Parties.

G.    **Consent**.  Although certain parties and Qualified Bidders argued as to which bid was the highest and best bid that was ultimately determined by the Court, no party in interest objected to the Sale of the Assets.

H.    **Title to Assets.**  The Trustee has all right, title, and interest in the Assets required to transfer and convey the Assets as contemplated by the Purchase Agreement.  The Assets constitute property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.

I.    **Opportunity to Bid.**   The Trustee marketed the Assets and conducted the marketing and sale process as set forth in the Sale Procedures Motion and in accordance with the Sale Procedures Order.   Any party interested in bidding on the Assets was provided, upon request, sufficient information by the Trustee and his professionals to make an informed judgment as to whether to bid on the Assets.  The Auction was conducted in accordance with the procedures set forth in the Sale Procedures Order.  Based upon the record of these proceedings, all Interested Parties and all prospective bidders or purchasers have been afforded a full, fair, and reasonable opportunity to bid for the Assets, and the process employed by the Trustee and his professionals, including, without limitation, the process set forth in the Sale Procedures Order, in connection with the Sale was adequate and reasonable to obtain the highest and best price for the Assets.

J.    **Highest and Best Bid; Successful Bidder.** As determined by the Court at the Sale Hearing and confirmed in its Order Denying Motion for Reconsideration, B and B Grove Properties, LLC submitted the highest and best bid for the Assets at the Auction and is therefore the Successful Bidder (within the meaning of the Sale Procedures Order). The total consideration of $5,400,000 submitted by B and B Grove Properties for the purchase of all of the Assets is the highest and best bid received by the Trustee.

K.    **Back-Up Bidder on Nassau Assets. Crunch Properties** is the Back-Up Bidder (within the meaning of the Sale Procedures Order) for the Nassau Assets pursuant to the Crunch

11

Nassau Bid in the amount of $3,395,500.00.  Crunch Properties has consented to be the Back-Up Bidder on the Nassau Assets pursuant to the terms of the Sale Procedures Order, and the Benitez Order and the Crunch Nassau Bid.

       L.      **Back-Up Bidder on Abbaco Assets**. **TC Grove Investments** is the Back-Up Bidder (within the meaning of the Sale Procedures Order) for the Abbaco Assets pursuant to the TC Abbaco Bid in the amount of $1,950,000.00.  TC Grove Investments has consented to be the Back-Up Bidder for the Abbaco Assets pursuant to the terms of the Sale Procedures Order and the TC Abbaco Bid.

       M.      **Business Justification.**  The Court has determined that good and sufficient cause exists for the Trustee to sell the Assets to B and B Grove Properties, enter into the Purchase Agreement, and consummate the Sale. Such cause includes (but is  not limited to) the following: (i) the Trustee has adequately marketed the Property; (ii) the Qualified Bidders, including Mr. Benitez, consented to the Sale of the Assets pursuant to the Sale Procedures Order and the Auction terms;  (iii) the Court has determined that the Purchase Price constituted the highest and best bid for the Assets and provides fair and reasonable consideration for same; (iv) the Purchase Agreement and closing thereon will present the best opportunity to realize the value of the Assets pursuant to an orderly sale process; (v) the consideration to be paid under the Purchase Agreement constitutes reasonably equivalent value and fair consideration; and (vi) entry of an order approving the Purchase Agreement and all provisions thereof is a condition precedent to B and B Grove Properties consummating the Sale. Accordingly, the Trustee has demonstrated a sound business purpose to sell the Assets and the Court has determined that the Purchase Price is the highest and best bid for the Assets, and that the Trustee should enter into the Purchase

Agreement, and consummate the Sale, other than in the ordinary course of business, pursuant to Section 363 of the Bankruptcy Code.

N.     **Good Faith Purchaser; Sale Price Not Controlled.**   The Purchase Agreement and the Sale have been negotiated and entered into by the Trustee and B and B Grove Properties in good faith, at arm's length, and without collusion or fraud.  B and B Grove Properties is not an "insider" of the Debtor or the Trustee as that term is defined in section 101 of the Bankruptcy Code.   The Assets were fully marketed and all interested bidders had a full and fair opportunity to bid on the Assets.   The Purchase Price was determined at the Auction. The terms and conditions of the Purchase Agreement, including the total consideration realized by the Trustee pursuant to the Purchase Agreement, are fair and reasonable, and the Sale is in the best interests of the Debtors' estates and its creditors.  All payments to be made by B and B Grove Properties in connection with the Sale have been disclosed.  B and B Grove Properties is a purchaser for value and in "good faith," as that term is used in the Bankruptcy Code and the decisions thereunder, will be acting in good faith pursuant to section 363(m) in closing the Sale at any time on or after entry of this Order, and is entitled to the protections of section 363(m) of the Bankruptcy Code with respect to the Assets.

O.     **No Collusive Conduct**. The sale price of the Assets was not controlled by an agreement between potential or actual bidders within the meaning of section 363(n) of the Bankruptcy Code.  The Trustee and B and B Grove Properties have not engaged in any conduct that would cause or permit the Purchase Agreement or the consummation of the Sale to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

P.     **Section 363(m) and (n)**. B and B Grove Properties has not engaged in any conduct that would prevent the application of section 363(m), or cause the application of section

13

363(n), of the Bankruptcy Code to B and B Grove Properties, the Purchase Agreement, or the Sale.

Q.    **Bidder Conduct Provisions Apply to Back-Up Bidders**. The findings of paragraphs N, O, and P of this Order shall and do apply equally to each of TC Grove Investments and Crunch Properties as Back-Up Bidders for the Abbaco Asset and Nassau Assets, respectively, in the event the Sale transaction with B and B Grove Properties does not close in accordance with the Purchase Agreement and this Order; provided however, that while Orlando Benitez, Jr. is an insider of the Debtors and the holder, directly and indirectly, of secured mortgage debt on the Nassau Assets and Abbaco Assets, the Court finds that such status does not and shall not impair, limit or prevent Mr. Benitez from being a good faith purchaser for value and otherwise having the benefits and protections set forth in paragraphs N, O and P above.

R.    **Trustee's Power and Authority.**    The Trustee has full power and authority to execute and deliver the Purchase Agreement and all other deeds, bills of sale, assignments, certificates, affidavits, closing statements and other documents contemplated thereby, to perform all of its respective obligations thereunder, and to consummate the Sale.

S.    **Free and Clear.**    Except with respect to the Permitted Exceptions, the Sale of the Assets to B and B Grove Properties will be, as of the Closing, a legal, valid and effective transfer of the Assets to B and B Grove Properties, and such transfer will vest B and B Grove Properties with all right, title and interest in the Assets free and clear of all Liens and Encumbrances with any Liens and Encumbrances to attach to the consideration to be received by the Trustee as of the Closing.  Except with respect to the Permitted Exceptions, B and B Grove Properties would not enter into the Agreement to acquire the Assets if the sale of the Assets were not free and clear of all Liens and Encumbrances, or if B and B Grove Properties would, or in the future

could, be liable for any such Liens and Encumbrances.  A sale of the Assets other than one free and clear of all Liens and Encumbrances would adversely impact the estate, and would likely yield substantially less value for the estate, with less certainty than this Sale.  Therefore, the sale contemplated by the Purchase Agreement is in the best interests of the Debtors' estates and their creditors, and all other parties in interest.

T.    **Section 363(f) is Satisfied.** The Trustee may sell the Assets free and clear of Liens and Encumbrances as provided in this Order and the Purchase Agreement, because one or more of the provisions set forth in section 363(f) of the Bankruptcy Code has been satisfied with respect to each of the Liens and Encumbrances.  Those holders of Liens and Encumbrances who did not object to the Sale Procedures Motion or the Sale are deemed to have consented to the Sale Procedures Motion, the Purchase Agreement, and the Sale of the Assets pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders of Liens and Encumbrances who did object, if any, fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code, and are adequately protected by having their Liens and Encumbrances, if any, attach to the proceeds of the Sale ultimately attributable to the Assets in which such holders allege Liens and Encumbrances, in the same order of priority, with the same validity, force and effect that such holder had before the Sale, and subject to the Benitez Order, that certain Order of the Court Granting Trustee's Motion to Approve Settlement Agreement with Alicia Diaz [ECF No. 184 in Nassau Case] (the "**Diaz Order**") and any claims and defenses the Debtor and its estate may possess with respect thereto.

U.    **No Assumed Liabilities; No Successor Liability.**  Except for the Permitted Exceptions, B and B Grove Properties is not assuming any of the debts, liabilities or obligations of the Debtors, and B and B Grove Properties shall not in any way be liable or responsible for

15

any liabilities, commitments, or obligations in any way related to the Debtors or the Assets arising before the Closing Date.  Except as expressly provided for in the Purchase Agreement and this Order, none of the Debtors or their respective estates shall in any way be liable or responsible for any liabilities, commitments, or obligations in any way related to the Assets arising from and after the Closing Date.

V.    **Fair and Adequate Consideration**. The terms and conditions of the Purchase Agreement, including the total consideration to be realized by the estates pursuant to the Purchase Agreement, are fair and reasonable, and constitute full and adequate consideration and reasonably equivalent value for the Assets.

W.    **No Fraudulent Transfer**.  The Sale is not for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession or the District of Columbia.  Neither the Trustee nor B and B Grove Properties are or will be entering into the Sale fraudulently.

X.    **Final Order**. This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  The Sale of the Assets, and the consummation of the Sale, must be approved and completed promptly so as to maximize the value of the assets to the Debtors' estates and therefore time is of the essence.  Consistent with Bankruptcy Rules 6004(h) and 6006(d), and to the extent necessary under Bankruptcy Rule 9014 and any rule of procedure made applicable thereby, the Court finds that there is no just reason for delay in implementation of this Order and that waiver of any applicable stay or other waiting period is appropriate, and expressly directs that this Order is immediately effective upon its entry.

Y.    **Compliance with Bankruptcy Code.**  The consummation of the Sale is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including

16

without limitation sections 363(b), 363(f), and 363(m), and all of the applicable requirements of such sections have been or will be complied with in respect of the Sale.

Based on the foregoing findings and conclusions, and for the reasons stated on the record at the Sale Hearing, it is **ORDERED, ADJUDGED, AND DECREED** that:

1.    **Relief Granted.**  The relief requested in the Sale Procedures Motion is granted in its entirety as set forth in this Order.

2.    **Prevailing Bidder.** Based on the record at the Auction and Sale Hearing, which is incorporated here by reference, B and B Grove Properties is the Prevailing Bidder.

3.    **Objections Overruled.**  All objections to the entry of this Order are overruled to the extent not otherwise withdrawn or resolved on the record at the Sale Hearing or in this Order.

4.    **Approval and Authorization.**  The Purchase Agreement and Sale are approved in all respects.  The Trustee is authorized, empowered, and directed to enter into, and to perform his obligations under the Purchase Agreement, and to execute, deliver and perform such agreements or documents and take such other actions as are necessary or desirable to effectuate the terms of the Purchase Agreement.

5.    **Certain Additional Authorizations**.  Upon Closing, B and B Grove Properties is authorized to file, register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Liens and Encumbrances (except the Permitted Exceptions) against or in the Assets provided for in this Order.

6.    **Authority.** The Trustee and B and B Grove Properties are authorized and empowered to take all actions and execute and deliver any and all documents and instruments that either the Trustee or B and B Grove Properties deem necessary or appropriate to implement

and effectuate the terms of the Purchase Agreement and this Order, including without limitation, trustee deeds, trustee affidavits, bills of sale, assignments, certificates, closing statements, releases, affidavits and similar documents required of the Trustee pursuant to, or contemplated by, the Purchase Agreement.  The Trustee and each other person having duties or responsibilities under the Purchase Agreement, any agreements related thereto or this Order, and their respective agents, representatives, and attorneys, are authorized and empowered, subject to the terms and conditions contained in the Purchase Agreement and the schedules annexed thereto, to carry out all of the provisions of the Purchase Agreement and any related agreements; to issue, execute, deliver, file, and record, as appropriate, the deeds, assignments and other documents necessary to effect closing under the Purchase Agreement, and any related agreements; and to take any and all actions contemplated by the Purchase Agreement, any related agreements or this Order.

7.      **Corrective Deed As To 3441 Grand Avenue in Nassau Estate.**  This Bankruptcy Court retains exclusive jurisdiction to consider any supplemental relief, court proceeding or related process to enforce the Trustee's rights to sell, and B and B Grove Properties' rights, title and interest to own in fee simple, the lot located at 3441 Grand Avenue, Coconut Grove, Florida.

8.      **Valid Transfer**.  Effective as of Closing, the sale of the Assets by the Trustee to B and B Grove Properties shall constitute a legal, valid and effective transfer of the Assets notwithstanding any requirement for approval or consent by any person and vest B and B Grove Properties with all right, title and interest in and to the Assets, free and clear of all Liens and Encumbrances (except the Permitted Exceptions) as provided in this Order.

9.      **Transfer of Title and Interests**.  Upon the occurrence of the Closing, this Order shall be considered and constitute for any and all purposes a full and complete general

assignment, conveyance, and transfer of the Assets, and/or a bill of sale or assignment transferring indefeasible title and interest in the Assets to B and B Grove Properties LLC.

10.    **Good Faith Purchaser**.  The sale of the Assets has been undertaken by the Trustee and B and B Grove Properties at arm's length, without collusion, in good faith and for value. B and B Grove Properties will acquire the Assets pursuant to the Purchase Agreement in good faith within the meaning of 11 U.S.C. § 363(m), and is granted all of the protections in accordance therewith. Accordingly, unless stayed pending appeal, the reversal or modification on appeal of the authorization provided herein shall not affect the validity or enforceability of the Purchase Agreement, the sale of the Assets to B and B Grove Properties, or the consummation of the Sale, and notwithstanding any reversal or modification on appeal, and any sale of the Assets and consummation of the Sale shall be governed in all respects by the provisions of the Purchase Agreement or this Order, as the case may be.

11.    **Back-Up Bidder on Nassau Assets.**  Crunch Properties is approved as the Back-Up Bidder for the Nassau Assets in the amount of $3,395,000.00.  Pursuant to the terms of the Sale Procedures Order, should B and B Grove Properties fail to close in accordance with the terms of the Purchase Agreement and this Order, Crunch Properties shall close on the Nassau Assets in accordance with the Crunch Nassau Bid and will be deemed the Purchaser and the Prevailing Bidder for the Nassau Assets. In connection therewith, the sale of the Nassau Assets to Crunch Properties will have been undertaken by the Trustee and Crunch Properties at arm's length, without collusion, in good faith and for value. In such situation, Crunch Properties will acquire the Nassau Assets pursuant to its Purchase Agreement with the Trustee in good faith within the meaning of 11 U.S.C. § 363(m), and is granted all of the protections in accordance therewith. Accordingly, unless stayed pending appeal, the reversal or modification on appeal of

the authorization provided herein shall not affect the validity or enforceability of the Purchase Agreement between Crunch Properties and the Trustee, the sale of the Nassau Assets to Crunch Properties, or the consummation of the Sale, and notwithstanding any reversal or modification on appeal, and any sale of the Nassau Assets and consummation of the Sale shall be governed in all respects by the provisions of the Purchase Agreement between the Trustee and Crunch Properties and this Order, as the case may be.

      12.    **Back-Up Bidder on Abbaco Assets.**  TC Grove Investments is approved as the Back-Up Bidder for the Abbaco Assets in the amount of $1,950,000.00.  Pursuant to the terms of the Sale Procedures Order, should B and B Grove Properties fail to close in accordance with the terms of the Purchase Agreement and this Order, TC Grove Investments shall close on the Abbaco Assets in accordance with the TC Abbaco Bid and will be deemed the Purchaser and the Prevailing Bidder for the Abbaco Assets.  In connection therewith, the sale of the Abbaco Assets to TC Grove Investments will have been undertaken by the Trustee and TC Grove Investments at arm's length, without collusion, in good faith and for value. In such situation, TC Grove Investments will acquire the Abbaco Assets pursuant to its Purchase Agreement with the Trustee in good faith within the meaning of 11 U.S.C. § 363(m), and is granted all of the protections in accordance therewith. Accordingly, unless stayed pending appeal, the reversal or modification on appeal of the authorization provided herein shall not affect the validity or enforceability of the Purchase Agreement between TC Grove Investments and the Trustee, the sale of the Abbaco Assets to TC Grove Investments, or the consummation of the Sale, and notwithstanding any reversal or modification on appeal, and any sale of the Abbaco Assets and consummation of the Sale shall be governed in all respects by the provisions of the Purchase Agreement between the Trustee and TC Grove Investments and this Order, as the case may be.

13.    **No Avoidance; No Damages.**  The Sale of the Assets pursuant to the Purchase Agreement may not be avoided, or constitute grounds for the imposition or recovery of damages under (i) Section 363(n) of the Bankruptcy Code, (ii) the fraudulent transfer provisions of the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, Uniform Fraudulent Transfer Act, or any similar laws of any state whose law is applicable to the Purchase Agreement, or (iii) any other provision of the Bankruptcy Code or other applicable non-bankruptcy law.

14.    **Free and Clear.**  Pursuant to section 363(f) of the Bankruptcy Code, the sale of the Assets pursuant to the Purchase Agreement and this Order shall be free and clear of any and all Liens and Encumbrances except the Permitted Exceptions.  All such Liens and Encumbrances (except the Permitted Exceptions) on and in respect of the Assets shall attach to the proceeds of the sale of the Assets pursuant to this Order, the Benitez Order and the Diaz Order to the same extent and with the same priority as such Liens and Encumbrances existed in respect of the Assets immediately prior to the Closing Date.

15.    **Liens Cannot Affect Title Post-Closing**.  Following the Closing, no holder of any Lien and Encumbrance (except Permitted Exceptions) on the Assets may interfere with B and B Grove Properties' use and enjoyment of the Assets based on or related to such Lien and Encumbrance, and no interested party may take any action to prevent, interfere with or otherwise enjoin consummation of the Sale.

16.    **Self-Executing Provisions**.  The provisions of this Order authorizing the sale of the Assets free and clear of Liens and Encumbrances (except Permitted Exceptions) shall be self-executing, and neither the Trustee nor B and B Grove Properties shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Order.

21

17.   **No Assumed Liabilities; No Successor Liability**.  Except as expressly set forth in the Purchase Agreement and this Order, B and B Grove Properties shall not be liable or obligated, or assume or in any way be responsible, for any liabilities or obligations of the Debtors, their estates or the Assets (whether direct or indirect, liquidated or unliquidated, choate or inchoate, or contingent or fixed) arising before the Closing Date.

18.   **Certain Assumed Liabilities and Permitted Exceptions**.   Notwithstanding anything to the contrary in this Order, the Permitted Exceptions survive the Closing as valid, legal and enforceable obligations of B and B Grove Properties, and the Permitted Exceptions are attached to, and perfected with respect to, the Assets with the same validity, legality and enforceability as before the commencement of the Debtors' bankruptcy cases.

19.   **Allocation of Purchase Price Between Debtors**.  The Trustee has determined the $5,400,000 Purchase Price for all of the Assets shall be allocated by the Court as follows: (i) to the estate of Nassau Development of Village West Corp., the sum of  $3,618,000 and (ii) to the estate of Grand Abbaco Development of Village West Corp., the sum of $1,782,000.

20.   **Brokers**.  There were no brokers involved in the Sale of the Assets.

21.   **Direction to Certain Parties**.  This Order shall be binding upon and govern the acts of all persons or entities, including, without limitation, all filing agents, recording agencies, secretaries of state and all other persons and entities who may be required by operation of law to accept, file, register or otherwise record or release any documents or instruments.

22.   **Cooperation**. All persons or entities, currently or on the Closing Date, in possession or control of some or all of the Assets are directed to surrender possession or control of the Assets to B and B Grove Properties on the Closing Date or at such time thereafter as B and B Grove Properties may request.

23.    **Failure to Specify Provisions**.  The failure specifically to include any particular provisions of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court, the Trustee, and B and B Grove Properties that the Purchase Agreement and its provisions are authorized and approved in their entirety with such amendments thereto as may be made by the parties in accordance with this Order before the Closing Date.

24.    **Binding Order**.  This Order and the Purchase Agreement shall be binding upon, and shall inure to the benefit of, the Trustee, Purchaser, and their respective successors and assigns.

25.    **Non-Severable Order.** The provisions of this Order are non-severable and mutually dependent.

26.    **Amendments**.  Any portion of the Purchase Agreement may be waived, modified, amended, or supplemented by written agreement of the Trustee and B and B Grove Properties without further action of the Court; provided, however, that any such waiver, modification, amendment, or supplement is not material and substantially conforms to and effectuates the Purchase Agreement.  Any material modification, amendment, or supplement to the Purchase Agreement must be approved by further Order of the Court following a motion on notice to all Interested Parties.

27.    **No Stay; Order Immediately Effective**.  Notwithstanding the provisions of Bankruptcy Rules 6004(h), 6006(d), or any other rule providing for a stay of the effectiveness of this Order, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing. The Trustee and B and B Grove Properties are free to close under the

Purchase Agreement in accordance herewith. Any party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay, or risk its appeal being rendered moot.

28.    **Conditions to Stay Pending Appeal; Return of Stalking Horse Bidder Deposits**.    Notwithstanding anything herein to the contrary, the sale of the Assets to B and B Grove Properties shall be immediately stayed pending any appeal of this Order by one possessing appellate standing upon the posting of a bond in the amount of $6,210,000.00 by the appealing party (the "Bond"), which constitutes 115% of the Purchase Price ($5,400,000.00). The appeal of this Order, coupled with the posting of the Bond, shall stay the sale of the Assets pending an appeal of this Order and/or the Order Denying Motion for Reconsideration (ECF No. 189) to the United States District Court for the Southern District of Florida. Upon the posting of the Bond, the sale of the Assets shall not proceed until the appeal is fully resolved and the Bond is fully discharged. The Bond may be discharged only by order of this Court after notice and hearing to all parties in interest, including B and B Grove Properties. The Bond shall constitute security for (i) any loss or damage suffered by the Nassau bankruptcy estate or the Grand Abbaco bankruptcy estate as a result of or related to the stay, including but not limited to, any increase in claims of creditors of either estate and (iii) any loss or damage suffered by B and B Grove Properties as a result of the stay. This order is not intended to confer standing on any party to pursue a claim against the bond. Parties in interest reserve any and all rights to pursue claims against the bond. Any such alleged losses or damages shall be determined and apportioned by the Court after notice and a hearing. In the event of an appeal of this Order by more than one appellant, any appellant who posted the Bond and subsequently withdraws or dismisses its appeal shall not be entitled to discharge of the Bond unless the Bond is replaced in full by any remaining appellant(s). Any such replacement bond shall then be deemed to constitute the Bond for purposes of this Paragraph 28.

Entry of this Order is without prejudice to B and B Grove Properties' right to challenge the standing of any entity or person who seeks rehearing or to appeal this Order. The Trustee is directed to return to the Stalking Horse Bidder all of its deposit funds as any stay pending an appeal shall not affect the return of the Stalking Horse Bidder's deposit funds held by the Trustee.

29.  **Reliance by Title Company.**  The Title Company shall be entitled to rely upon this Order in connection with the issuance by the Title Company to B and B Grove Properties, its successors, assigns and subsequent transferees of all or any portion of the Nassau Real Property and/or the Abbaco Real Property, of any owner's title insurance policy and/or mortgagee's title insurance policy, in each case, covering all or any portion of the Nassau Real Property and/or the Abbaco Real Property. This provision shall apply equally to the Title Company for each of Crunch Properties and TC Grove Investments as Back-Up Bidders in connection with the closing, if applicable, of the sale of the Nassau Assets and Abbaco Assets, respectively.

30.  **Governing Terms**.  To the extent this Order is inconsistent with any prior order or pleading in this chapter 11 case, the terms of this Order shall govern, provided however that nothing in this Order shall limit, affect or impair the rights of Mr. Benitez under the Benitez Order.  To the extent there is any inconsistency between the terms of this Order and the terms of the Purchase Agreement (including all ancillary documents executed in connection therewith), the terms of the Order shall govern.

31.  **Further Assurances**.  From time to time, as and when requested by any party to the Purchase Agreement, each such party shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as such other party may reasonably deem necessary or desirable to consummate the Sale, including, such actions as may be necessary to vest or perfect in B and B Grove

25

Properties, or to confirm, record or otherwise evidence, its right, title, and interest in and to the Assets.

32.    **Headings**.  Headings of the provisions of this Order are included for reference purposes only and are not to be given any substantive effect.

33.    **Retention of Jurisdiction**.  The Bankruptcy Court shall retain jurisdiction to (a) interpret, implement and enforce the terms and provisions of this Order, the Sale Procedures Order, and the Purchase Agreement, including all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith, in all respects, (b) to decide any disputes concerning this Order and the Purchase Agreement, or the rights and duties of the parties hereunder or thereunder or any issues relating to the Purchase Agreement and this Order including, but not limited to, the interpretation of the terms, conditions and provisions hereof and thereof, the status, nature and extent of the Assets and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning the transfer of the assets free and clear of all Liens and Encumbrances.

34.    **Supplemental Order**. In the event the Sale transaction with B and B Grove Properties does not close as required by the Purchase Agreement and this Order, and the Trustee proceeds with a closing with each of the Back-Up Bidders as a result, then upon the request of either Back-Up Bidder or the Trustee, the Court will entertain any supplemental orders confirming such sales to the Back-Up Bidders and making any findings or conclusions in connection therewith based on the record before the Court.

<div align="center">###</div>

Submitted by:

Corali Lopez-Castro
Florida Bar No. 863830
**KOZYAK TROPIN & THROCKMORTON, LLP**

*Attorneys for B and B Grove Properties LLC*
2525 Ponce de Leon Blvd., 9th Floor
Miami, Florida 33134
Telephone: (305) 372-1800
Facsimile:  (305) 372-3508
E-mail: clc@kttlaw.com

Copies furnished to:

Corali Lopez-Castro, Esq.
[Attorney Lopez-Castro is directed to serve copies of this order on all interested parties and to file a certificate of service]

## SCHEDULE 1.1

## NASSAU REAL PROPERTY

**3441 Grand Avenue, Miami, Florida 33133**

Lots 17 and 18, Less the South 10 feet thereof, Block 23 of AMENDED PLAT OF THE FROW HOMESTEAD, according to the Plat thereof as recorded in Plat Book B, Page 106, of the Public Records of Miami-Dade County, Florida.

**3461 Grand Avenue, Miami, Florida 33133**

Lots 15 and 16, Less the South 10 feet thereof, Block 23 of AMENDED PLAT OF THE FROW HOMESTEAD, according to the Plat thereof as recorded in Plat Book B, Page 106, of the Public Records of Miami-Dade County, Florida.

**3412 Florida Avenue, Miami, Florida 33133**

Lot 2, Block 23, of AMENDED PLAT OF THE FROW HOMESTEAD, according to the Plat thereof as recorded in Plat Book B, Page 106, of the Public Records of Miami-Dade County, Florida.

**3400 Florida Avenue, Miami, Florida 33133**

Lot 1, Block 23, of AMENDED PLAT OF THE FROW HOMESTEAD, according to the Plat thereof as recorded in Plat Book B, Page 106, of the Public Records of Miami-Dade County, Florida.

## SCHEDULE 1.2

## ABBACO REAL PROPERTY

**3364 Grand Avenue, Miami, Florida 33133**

Lots 17 and 18, Less the North 10 feet thereof, Block 28, of AMENDED PLAT OF THE FROW HOMESTEAD, according to the Plat thereof as recorded in Plat Book B, Page 106, of the Public Records of Miami-Dade County, Florida.

**3384 Grand Avenue, Miami, Florida 33133**

Lot 19, Less the North 10 feet thereof, and the East 1/2 of Lot 20, less the North 10 feet thereof, Block 28, of AMENDED PLAT OF THE FROW HOMESTEAD, according to the Plat thereof as recorded in Plat Book B, Page 106, of the Public Records of Miami-Dade County, Florida.

**EXHIBIT A**

**PURCHASE AGREEMENT**

**[B AND B GROVE PROPERTIES LLC, AS BUYER]**

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**") is dated and entered into as of October **27**, 2017, by and between DREW M. DILLWORTH ("**Seller**" and/or "**Trustee**"), not individually but as Chapter 11 bankruptcy trustee for (i) NASSAU DEVELOPMENT OF VILLAGE WEST, CORP., a Florida corporation ("**Nassau Debtor**"), and (ii) GRAND ABBACO DEVELOPMENT OF VILLAGE WEST CORPORATION, a Florida corporation ("**Abbaco Debtor**"), and B AND B GROVE PROPERTIES LLC, a Delaware limited liability company, and/or assigns ("**Purchaser**").

## RECITALS:

A.     On October 2, 2015 (the "**Nassau Petition Date**"), the Nassau Debtor filed a voluntary petition under chapter 11 of the United States Bankruptcy Code, which proceeding is pending under Case No. 15-27691-AJC (the "**Nassau Bankruptcy Case**") in the United States Bankruptcy Court for the Southern District of Florida, Miami Division (the "Bankruptcy Court").

B.     Drew M. Dillworth was appointed and approved by the Bankruptcy Court as the chapter 11 trustee (the "**Nassau Trustee**") pursuant to an order [Nassau ECF No. 70] entered by the Bankruptcy Court on June 6, 2016.

C.     On March 27, 2016 (the "**Abbaco Petition Date**"), the Abbaco Debtor filed a voluntary petition under chapter 11 of the United States Bankruptcy Code, which proceeding is pending under Case No. 16-14286-AJC (the "**Abbaco Bankruptcy Case**") in the Bankruptcy Court.

D.     Drew M. Dillworth was appointed and approved by the Bankruptcy Court as the chapter 11 trustee (the "**Abbaco Trustee**," and together with the Nassau Trustee, the "**Trustee**") pursuant to an order [Abbaco ECF No. 129] entered by the Bankruptcy Court on April 19, 2017.

E.     Seller owns the real properties in the name of the Nassau Debtor as more specifically described and identified in the attached ***Schedule 1.1*** (collectively, the "**Nassau Real Property**").

F.     Seller owns the real properties in the name of the Abbaco Debtor as more specifically described and identified in the attached ***Schedule 1.2*** (collectively, the "**Abbaco Real Property**," and together with the Nassau Real Property, the "**Real Property**").

G.     Seller desires to sell and Purchaser desires to purchase the Real Property pursuant to section 363 of the Bankruptcy Code on the terms and subject to the conditions set forth in this Agreement.

1

8107874-10

**NOW THEREFORE,** in consideration of the representations, warranties, covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Purchaser and Seller hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1     *Definitions.* In addition to those capitalized terms that are elsewhere defined in this Agreement, the following terms shall have the corresponding meanings:

"**Abbaco Assets**" shall mean the collective reference to (i) the Abbaco Real Property and (ii) all personal property owned by Seller and used in the operation of the Abbaco Real Property.

"**Abbaco Real Property**" has the meaning set forth in the Recitals.

"**Agreement**" has the meaning set forth in the preamble.

"**Alternative Offer**" has the meaning set forth in Section 5 of the Bid Procedures.

"**Assets**" has the meaning set forth in Section 2.1.

"**Auction**" has the meaning set forth in Section 2(b) of the Bid Procedures.

"**Back-Up Bidder**" has the meaning set forth in Section 4 of the Bid Procedures.

"**Bankruptcy Code**" means the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*

"**Bankruptcy Court**" has the meaning set forth in Recital A.

"**Bankruptcy Laws**" means the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the local rules and orders of the Bankruptcy Court, all as amended from time to time.

"**Bidding Procedures**" means the bidding procedures as approved by the Bankruptcy Court, as modified by the Notice Extending Bid Deadlines which was filed by the Trustee in both the Nassau Bankruptcy Case and in the Abbaco Bankrupty Case on September 22, 2017.

"**Bidding Procedures Order**" means the collective reference to the orders of the Bankruptcy Court that, among other things, approves the Bid Procedures which were granted by the Court (i) on August 23, 2017 in the Abbaco Bankruptcy Case and (ii) on August 23, 2017, in the Nassau Bankruptcy Case.

2

**"Closing"** has the meaning set forth in Section 6.1.

**"Closing Agent"** has the meaning set forth in Section 6.1.

**"Closing Date"** has the meaning set forth in Section 6.1.

**"Covenants, Restrictions and Easements"** means any and all usage and development terms, conditions, guidelines, covenants, restrictions and easements applicable or relating to the Real Property which are recorded on or before the Effective Date in the Public Records of Miami-Dade County, Florida.

**"Deposit"** has the meaning set forth in Section 2.4.

**"Due Diligence Package"** has the meaning set forth in Section 2.5(a).

**"Effective Date"** means June 30, 2017, which is the "effective date" of the stalking horse agreement described in the Bidding Procedures Order.

**"Escrow Agent"** means Seller's counsel, Meland, Russin & Budwick, P.A., or such other Person as Purchaser and Seller mutually agree and appoint to hold the Deposit in escrow.

**"Governmental Entity"** means any foreign or United States federal, state, local or municipal government, court, administrative agency or commission or other governmental or other regulatory authority or agency.

**"Nassau Assets"** shall mean the collective reference to (i) the Nassau Real Property and (ii) all personal property owned by Seller and used in the operation of the Nassau Real Property.

**"Nassau Real Property"** has the meaning set forth in the Recitals.

**"Permitted Exceptions"** means liens for taxes and assessments not yet due or payable; any law, ordinance or government regulations that apply to the Assets; any Covenants, Restrictions and Easements that are of record prior to the Effective Date; any rights of parties to any third party contract that Purchaser shall assume at Closing, to the extent such rights are title encumbrances; any matters of record prior to the Effective Date (expressly excluding as a "Permitted Exception" any title issues raised by that certain Quit Claim Deed recorded in Official Records Book 21675, Page 3341 executed in favor of Rosa Benitez); any matters of record subsequent to the Effective Date approved in writing by Purchaser; exceptions or conditions to title identified by any title commitment obtained by Purchaser; matters that would be disclosed by a current survey of the real property comprising the Real Property; and municipal or county liens for code violations and open permits; provided however, Permitted Exceptions shall not include any (i) liens intended to secure monetary indebtedness for items such as mortgage liens, tax liens, judgment liens, mechanic's or materialmen liens; or (ii) lis pendens or any other matters relating to lien claims; or (iii) tax sale certificates of record.

**"Person"** means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including without limitation, a Governmental Entity.

**"Property Taxes"** means ad valorem taxes imposed upon the Assets.

**"Proration Items"** has the meaning set forth in Section 2.6.

**"Purchase Price"** has the meaning set forth in Section 2.3.

**"Purchaser"** has the meaning set forth in the preamble.

**"Sale Order"** has the meaning set forth in **Section 3** of the Bid Procedures.

**"Schedules"** means the schedules referenced in and attached to this Agreement.

**"Seller"** has the meaning set forth in the preamble.

**"Title Agent"** means Berger Singerman LLP, Purchaser's legal counsel.

**"Title Company"** means Old Republic National Title Insurance Company, Fidelity Title Insurance Company, First American Title Insurance Company or such other national title insurance company acceptable to Purchaser.

**"Utility Charges"** means water, sewer, electricity, gas and other utility charges, if any, applicable to the facilities owned by Seller at the Real Property.

## ARTICLE II
## PURCHASE AND SALE OF THE ASSETS AND LIABILITIES

2.1    *Sale and Transfer of the Assets.* At Closing, Seller will sell, assign, transfer and convey to Purchaser all of Seller's right, title and interests in and to the following assets (collectively, the **"Assets"**), free and clear of all liens to the extent provided in the Sale Order and subject to the Permitted Exceptions:

        (a)    The Real Property; and

        (b)    All personal property owned by Seller and used in the operation of the Real Property.

2.2    *The Excluded Assets.* Seller shall not sell, Purchaser shall not purchase or acquire, and the Assets shall not include the following (collectively, the **"Excluded Assets"**):

        (a)    Any cash or cash equivalents owned or held by Seller or its bankruptcy estate, except for any tenant security deposits;

        (b)    Any deposits that Seller has made with the State of Florida, local county or municipal governments, or any of such entities' divisions, agencies or authorities, utility companies, suppliers of materials, contractors or other third party public or private entities;

8107874-10

(c)     Any letters of credit made by third parties on behalf or for the benefit of Seller and any proceeds of or interest on the proceeds of any such letters of credit;

(d)     Whether or not yet filed, determined or received, any and all tax refunds or other refunds, adjustments, deposits or rebates due Seller from any private or public entity, to the extent related to activities or time periods occurring before the Closing; provided, that if payment or realization of any such refund, adjustment, deposit or rebate occurs after Closing (unless it is ascertainable before Closing, in which event the Purchase Price shall be increased at Closing to reflect such refund, adjustment, deposit or rebate), Purchaser promptly will remit the amount of the same to Seller upon receiving notice of the same of the public or private entity issuing such payment or causing such realization (provided that the foregoing shall not diminish Purchaser's right to receive the Governmental Fees that are included within the Assets);

(e)     Whether or not yet filed, any and all insurance claims and refunds to the extent related to the Excluded Assets or activities or time periods occurring before the Closing, except as provided in Section 9.6 of this Agreement;

(f)     Whether or not yet filed, any and all causes of action, including, without limitation, causes of action arising under the Bankruptcy Code, including proceeds arising therefrom, in each case, related to activities or time periods occurring before the Closing; and

(g)     All property and assets of Seller not listed or described in Section 2.1.

2.3     *Purchase Price and Other Consideration.* In consideration of the sale, transfer, conveyance, assignment and delivery of the Assets, and in reliance upon the representations and warranties made herein by Seller, Purchaser in payment for the Assets shall pay to Seller in cash at Closing the aggregate amount of **$5,400,000.00** (the "**Purchase Price**") for the Assets, which shall be allocated as follows:

(a)     the sum of Three Million Six Hundred Eighteen Thousand and No/100 Dollars ($3,618,000.00) for the Nassau Assets (the "**Nassau Purchase Price**"), which Nassau Purchase Price is allocated for each Nassau Real Property as set forth in the Bidding Procedures Order; and

(b)     the sum of One Million Seven Hundred Eighty Two Thousand and No/100 Dollars ($1,782,000.00) for the Abbaco Assets (the "**Abbaco Purchase Price,**"), which Abbaco Purchase Price is allocated for each Abbaco Real Property as set forth in the Bidding Procedures Order.

2.4     *Earnest Money Deposit.* Contemporaneously with its execution and delivery of this Agreement to Seller, Purchaser shall pay to Escrow Agent an earnest money deposit in the amount of Two Hundred Thousand and 00/100 Dollars ($200,000.00) (the "**Deposit**") which shall be allocated as follows: One Hundred Thousand and 00/100 Dollars ($100,000.00) for the Nassau Purchase Price (the "**Nassau Deposit**"); and, One Hundred Thousand and 00/100 Dollars ($100,000.00) for the Abbaco Purchase Price (the "**Abbaco Deposit**"). The Deposit shall be held by Escrow Agent in trust and escrow pending the Closing or termination of this Agreement, and the amount of the Deposit shall (i) be applied and credited

5

against the Nassau Purchase Price and Abbaco Purchase Price at Closing, respectively, or (ii) in the event of a termination, refunded to Purchaser or disbursed to Seller in accordance with the terms and provisions of this Agreement. Except as otherwise may be provided herein, the Deposit shall be held by Escrow Agent in a non-interest bearing account to be established by Escrow Agent. Unless otherwise expressly stated herein, Purchaser and Seller agree that the Deposit is fully earned, non-refundable, and at risk as of the date of this Agreement.

    2.5    *Inspection of Assets.*

        *(a)*    Purchaser agrees that the Deposit is fully earned and non-refundable, except as otherwise provided in this Agreement, and Purchaser shall be deemed to (i) have completed its due diligence; (ii) have waived any further right to undertake any additional review, due diligence, investigations, and inquiries pertaining to the Assets and the Real Property; and (iii) acknowledge that the Assets are suitable for Purchaser's intended uses, meet Purchaser's expectations, and are appropriate or acceptable for purchase by Purchaser. EXCEPT FOR THE REPRESENTATIONS SET FORTH IN ARTICLE III OF THIS AGREEMENT, PURCHASER WILL BE PURCHASING THE ASSETS PURSUANT TO ITS INDEPENDENT EXAMINATION, STUDY, INSPECTION AND KNOWLEDGE OF THE ASSETS. PURCHASER IS RELYING UPON ITS OWN DETERMINATION OF THE QUALITY, VALUE AND CONDITION OF THE ASSETS, AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY SELLER AND/OR SELLER'S AGENTS.

        *(b)*    *Intentionally omitted.*

        *(c)*    *Access to Assets.* Seller may, upon request of Purchaser, provide Purchaser with reasonable entry and access to the Real Property. Purchaser will coordinate its entry on to the Real Property with Seller so that Seller shall have the option of having one or more of its representatives present at any and all on-site inspections.

        *(d)*    *Inspection Costs / Damages.* All inspections, investigations, and examinations of the Assets have been and shall be undertaken at Purchaser's sole cost and expense. Purchaser shall promptly restore and repair any damage caused by Purchaser to substantially the same condition that existed immediately prior to Purchaser's inspection, and Purchaser hereby covenants and agrees to indemnify and hold harmless Seller and any of his employees, agents, representatives, accountants or attorneys, from any and all claims against them or the Assets arising from, or caused by, Purchaser's inspections. The terms and covenants of this subsection shall survive the Closing or termination of this Agreement.

        *(e)*    *Confidentiality.* Purchaser hereby covenants and agrees that, except as required by law and except to the extent provided to Purchaser's agents, representatives, potential investors and lenders and for the purpose of conducting its due diligence or pursuing the transaction contemplated by this Agreement, Purchaser and its employees, representatives and agents (i) shall not disclose to any third Person or Governmental Entity non-public information, or other proprietary information, contained in the Seller's books and records, or any other information provided to Purchaser by Seller, and (ii) shall not report or disclose to any third person or Governmental Entity any non-public data, results, tests, or work product obtained in connection with Purchaser's inspection of the Assets, including, but not limited to,

any appraisals of the Assets. The terms and covenants of this subsection shall survive the Closing or termination of this Agreement.

(f)    *Return of Information.* In the event this Agreement is terminated by Purchaser or Seller for any reason, Purchaser covenants and agrees it shall immediately destroy or return to Seller all of the documents and information provided to Purchaser, including copies thereof, in the control or possession of Purchaser or its representatives and agents. The terms and covenants of this subsection shall survive the termination of this Agreement.

2.6    *Prorations.* Seller shall be responsible for all costs and expenses arising before and including the Closing Date related to the Assets and the Real Property, including, without limitation, all Utility Charges and Property Taxes. Purchaser shall only be responsible for all such costs and expenses and shall be entitled to all such income related to the Assets for the period after the Closing Date. All Utility Charges and Property Taxes for 2017 to be prorated are herein referred to as the **"Proration Items."** The Proration Items shall be prorated and apportioned through the Closing Date, with the Proration Items for the Closing Date belonging to Seller in accordance with the foregoing, on the basis of a 365-day year and reflected as an appropriate adjustment to the Purchase Price.

2.7    *Intentionally omitted.*

2.8    *Transaction Costs.* Purchaser shall be responsible for the costs of conducting its due diligence studies, the costs of issuance of any title reports, title commitments, and title policies for the Real Property, the recording fees for the deed of conveyance, documentary and stamp taxes, including, but not limited to any surtax, any financing instruments, and any of Purchaser's attorneys' fees.

2.9    *"As Is, Where Is."*

(a)    IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT PURCHASER ACCEPTS THE CONDITION OF THE ASSETS **"AS IS, WHERE IS--WITH ALL FAULTS"** WITHOUT ANY IMPLIED REPRESENTATION, WARRANTY OR GUARANTEE AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE AS TO THE CONDITION, SIZE OR VALUE OF SUCH PROPERTY, EXCEPT ONLY AS MAY BE OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT AND SELLER HEREBY EXPRESSLY DISCLAIMS ANY AND ALL SUCH IMPLIED REPRESENTATIONS, WARRANTIES OR GUARANTEES. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WITH RESPECT TO (A) THE VALUE, NATURE, QUALITY, OR CONDITION OF THE ASSETS BEING SOLD, (B) THE SUITABILITY OF THE ASSETS FOR ANY ACTIVITIES THAT PURCHASER MAY CONDUCT THEREON, (C) THE COMPLIANCE OF THE ASSETS WITH ANY LAWS, ORDINANCES, OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL ENTITY, (D) COMPLIANCE OF THE ASSETS WITH ANY ENVIRONMENTAL PROTECTION, POLLUTION, OR LAND USE LAWS, RULES, REGULATIONS, ORDERS, OR REQUIREMENTS, INCLUDING THE EXISTENCE IN OR ON THE PROPERTY OF HAZARDOUS MATERIALS, (E) THE ZONING, TAX CONSEQUENCES, PHYSICAL

8107874-10

CONDITION, UTILITY CAPACITY OR COMMITMENT FOR UTILITY CAPACITY, OPERATING HISTORY OR PROJECTIONS, VALUATIONS, GOVERNMENTAL APPROVALS OR GOVERNMENTAL REGULATIONS WHICH MAY BE APPLICABLE, COMPLIANCE WITH SPECIFICATIONS, LOCATION, EXISTENCE OF, OR COMPLIANCE WITH APPLICABLE LAWS, RULES, REGULATIONS, RESTRICTIVE COVENANTS OR OTHER ENCUMBRANCES OF, TO OR BY THE REAL PROPERTY, (F) THE ADEQUACY OF DESIGN, SUITABILITY, QUALITY, DESCRIPTION, DURABILITY, OR QUALITY OF MATERIAL OR WORKMANSHIP OF THE REAL PROPERTY, OR (G) ANY OTHER MATTER WITH RESPECT TO THE ASSETS, EXCEPT AS SET FORTH IN THIS AGREEMENT.

Without limiting the above, upon Closing the Purchaser on behalf of itself and its successors and assigns waives and releases Seller and his employees, officers, agents and their respective successors and assigns from any and all demands, claims, legal or administrative proceedings, losses, liabilities, damages, penalties, fines, liens, judgments, costs or expenses whatsoever (including, without limitation, attorneys' fees and costs), whether direct or indirect, known or unknown, foreseen or unforeseen, arising from or relating to the Assets including the physical condition of the Real Property or any tenant claim (except any tenant claim which date of loss occurred during the pendency of the Nassau Bankruptcy Case or Abbaco Bankruptcy Case, respectively) in connection with the Real Property or any law or regulation applicable thereto, including the presence or alleged presence of asbestos or harmful or toxic substances in, on, under or about the Assets, including, without limitation, any claims under or on account of (i) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as the same may have been or may be amended from time to time, and similar state statutes, and any rules and regulations promulgated thereunder, (ii) any other federal, state or local law, ordinance, rules or regulation, now or hereafter in effect, that deals with or otherwise in any manner relates to, environmental or health and safety matters of any kind, or (iii) this Agreement or the common law.

(b)    Purchaser acknowledges that as an accommodation to Purchaser, if and only if the Purchaser requests the Seller in written request prior to the Closing, then, Seller shall prior to Closing: (i) with respect to the Nassau Real Property, provide all tenants in the Nassau Real Property with a fifteen (15) day termination notice pursuant to § 83.57, Florida Statutes (2016); and, (ii) with respect to the Abbaco Real Property, provide Bain Range Funeral Service, P.A., with a fifteen (15) day termination notice pursuant to § 83.03(3), Florida Statutes (2016). Purchaser further acknowledges there may exist hold-over tenants in the Nassau Real Property and Abbaco Real Property at the time of Closing. Purchaser further acknowledges that the removal of such hold-over tenants is not a condition precedent to Closing, that Seller and Purchaser shall consummate this transaction pursuant to the terms of this Agreement irrespective of whether there exist hold-over tenants in the Nassau Real Property or Abbaco Real Property at the time of Closing, and that Seller shall have no responsibility, obligation, or liability whatsoever to remove such hold-over tenants or provide any further notice(s) at, prior to, or following Closing from the Nassau Real Property or Abbaco Real Property, as the case may be. The parties acknowledge and agree that Seller shall have no obligation to deliver the Nassau Real Property and Abbaco Real Property vacant at the time of Closing. Following Closing, Purchaser hereby indemnifies and holds Seller and its shareholders, officers, employees, agents, members, guests and other invitees harmless from all injury, damage, loss, cost or expense,

8

including, but not limited to, reasonable attorneys' fees and court costs resulting from or arising through the hold-over tenants, if any, and the notices provided herein. The provisions of this paragraph shall survive Closing and any cancellation or termination of this Agreement.

(c)    Seller shall have no obligation to close and/or pay any open permits or code violations on either the Nassau Real Property or Abbaco Real Property.

(d)    The provisions of this Section 2.9 shall survive the Closing.

2.10 *Limitation of Seller's Liability*. In no event shall Seller be liable under this Agreement for any incidental, indirect, impact, consequential or punitive damages, or in the cumulative.

2.11 *Title*. Seller shall convey title to the Real Property by trustee's deed free and clear of all liens except for Permitted Exceptions.

2.12 *Possession*. Possession of the Assets shall be delivered to Purchaser on the Closing Date; provided, however, Seller shall have up to thirty (30) days after Closing within which to remove any Excluded Assets belonging to Seller and located at the Real Property, all without cost or charge to Purchaser. Any Excluded Assets not removed within such 30-day period shall become the sole property and possession of Purchaser. Seller shall be responsible, at Seller's sole cost and expense, for any damage caused by Seller's removal activities, which liability shall survive Closing.

2.13 *Non-Assumed Liabilities*. Seller and Purchaser acknowledge and agree that, other than with respect to liabilities and obligations that Purchaser expressly assumes or covenants to satisfy and perform pursuant to the terms of this Agreement, Purchaser is not assuming or becoming liable for any debts, liabilities, losses, accounts payable, indebtedness, mortgages or any other obligations of Seller, or any of its officers, directors, employees, agents, representatives or attorneys, including but not limited to any claims for commissions or similar compensation made by any Person (whether employees or agents of Seller or Seller's affiliates, or co-brokers) respecting any contracts for the use of any portion of the Real Property that are in force and executory as of the Closing Date, or any claims filed against them in the Bankruptcy Case, whether the same are known or unknown, now existing or hereafter arising, of whatever nature or character, whether absolute or contingent, liquidated or disputed.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser as follows:

3.1    Seller, acting as the Bankruptcy Court appointed trustee, and upon entry of the Sale Order, will have the requisite corporate power and authority to execute and deliver this Agreement and any documents required to consummate the transactions contemplated by this Agreement.

8107874-10

3.2    Upon entry of the Sale Order, this Agreement shall be a valid and binding obligation of Seller, enforceable against him as Chapter 11 trustee in accordance with its terms.

3.3    To the Seller's actual (not constructive) knowledge, there are no leases affecting the Real Property except the written leases listed in the Debtor Schedules (hereinafter defined) and the oral leases, if any, described on **Schedule 3.3** attached hereto.  In no event shall any constructive knowledge be imputed to the Seller under this Section 3.3.

3.4    To the Seller's actual (not constructive) knowledge, there are no third party contracts affecting the Real Property, other than (i) the written and oral leases described in Section 3.3 and (ii) the recorded documents which are recorded in the public records of Miami-Dade County with respect to the Real Property. In no event shall any constructive knowledge be imputed to the Seller under this Section 3.4.

For the purposes of Sections 3.3 and 3.4 above, the term "actual knowledge" shall be limited to:

   a.    The leases disclosed in the schedules filed by the Nassau Debtor and the Abbaco Debtor with the Bankruptcy Court (collectively, the "Debtors Schedules"); as to which Debtor Schedules, Seller makes no representation or warranty as to accuracy or completeness;
   b.    The rent payments actually received by the Trustee from the Assets as reported by the Trustee in the Trustee's Monthly Financial Report;
   c.    The Trustee's personal site visit observations, without investigation or inquiry by the Trustee or his counsel.

In addition, non-material discrepancies shall not constitute a breach of Sections 3.3 and 3.4 above.

3.5    Notwithstanding anything to the contrary set forth in this Agreement or otherwise, the Trustee makes no representation or warranty (express or implied) regarding (i) the validity of any such written or oral leases affecting the Assets or (ii) the collectability of, or under, any such written or oral leases from any of the purported tenants thereunder.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller as follows:

4.1    *Corporate Organization and Qualification.* Purchaser is a Limited Liability Company, validly existing and in good standing under the laws of the state of Delaware.

4.2    *Corporate Authority.* Purchaser has the requisite limited liability power and authority to execute and deliver this Agreement and any documents required to consummate the transactions contemplated by this Agreement. The execution and delivery of this Agreement by Purchaser has been duly authorized by all necessary limited liability company actions of Purchaser. This Agreement is a valid and binding obligation of Purchaser, enforceable against it in accordance with its terms.

10

8107874-10

4.3 *Conflicts and Defaults.* Neither the execution and delivery of this Agreement by Purchaser nor the performance by Purchaser of the transactions contemplated hereby will, to Purchaser's knowledge, violate or constitute an occurrence of default under any provision of, or conflict with, or result in acceleration of any obligation under, or give rise to a right by any party to terminate its obligations under, any material contract, instrument, order, judgment, decree, or other arrangement to which Purchaser is a party or is bound. Purchaser is not in violation of any of its organizational documents.

4.4 *Consents and Approvals.* No consent, approval, order or authorization of, or registration, declaration or filing with, any Governmental Entity or any Person is required with respect to Purchaser in connection with the execution, delivery or performance by Purchaser of its obligations under this Agreement except for consents, approvals, orders, authorizations, registrations, declarations or filings the failure of which to obtain or to make would not be material.

4.5 *Funds for the Acquisition.* Purchaser has access to sufficient unencumbered funds to pay in cash the Purchase Price and all of its fees and expenses relating to this Agreement and the transactions contemplated hereby.

4.6 *OFAC Compliance.* Neither Purchaser nor, to Purchaser's actual knowledge, any Person (defined below) who owns a direct or indirect interest in Purchaser (collectively, a "Purchaser Party") is now nor shall be at any time until the Closing under this Agreement a Person with whom a U.S. Person, including a Financial Institution, is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under United States law, regulation, executive orders and lists published by OFAC (including those executive orders and lists published by OFAC with respect to Persons that have been designated by executive order or by the sanction regulations of OFAC as Persons with whom U.S. Persons may not transact business or must limit their interactions to types approved by OFAC) or otherwise.

4.7 *Anti-Money Laundering.* Neither Purchaser nor, to Purchaser's actual knowledge, any Purchaser Party, nor to Purchaser's actual knowledge, any Person providing funds to Purchaser in connection with the transaction contemplated hereby (i) is under investigation by any governmental authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist related activities, any crimes which in the United States would be predicate crimes to money laundering or any violation of any Anti-Money Laundering Laws or any violation of any Anti-Corruption Laws; (ii) has been assessed civil or criminal penalties under any Anti-Money Laundering Laws or under any Anti-Corruption Laws; or (iii) has had any of its funds seized or forfeited in any action under any Anti Money Laundering Laws or any Anti-Corruption Laws.

11

## ARTICLE V
## BANKRUPTCY COURT APPROVAL

5.1    *Cooperation.*

(a)    Seller shall use all commercially reasonable efforts to (i) obtain all consents and approvals of all governments, and all other Persons, required to be obtained by Seller to effect the transactions contemplated by this Agreement, and (ii) take or cause to be taken, all action, and to do, or cause to be done, all things necessary or proper, consistent with applicable law, to consummate and make effective in an expeditious manner the transactions contemplated hereby.

(b)    At the request and expense of Purchaser, at any time after the Closing Date, Seller shall execute and deliver such documents as Purchaser or its counsel may reasonably request to effectuate the purpose of this Agreement.

(c)    To the extent Seller and Purchaser enter into this Agreement prior to the entry of the Sale Order, Seller and Purchaser shall use commercially reasonable efforts to cooperate, assist and consult with each other to secure the entry of the Sale Order following the date hereof, and to consummate the transactions contemplated by this Agreement, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court. Purchaser may require any affidavits relating to its financial information to be submitted in camera and only pursuant to a protective order.

5.2    *Approval.* Seller and Purchaser acknowledge that this Agreement and the sale of the Assets are subject to approval by the Bankruptcy Court (the "**Bankruptcy Court Approval**"). Seller and Purchaser acknowledge that the sale of the Assets to Purchaser is subject to higher and better offers in accordance with the Bid Procedures and the Bid Procedures Order. Seller and Purchaser also acknowledge that the payoffs for the existing debts, liens and other monetary encumbrances on the Real Property may exceed the Purchase Price and thus Seller and Purchaser acknowledge that this Agreement and the sale of the Assets are subject to approval by the Bankruptcy Court with respect to same.

5.3    *Bidding Matter.* Seller and Purchaser acknowledge that Seller may seek or entertain one or more bids for the purchase of the Assets, either as a whole or separate bids for the Nassau Assets and the Abbaco Assets, in accordance with the Bid Procedures and that the Bid Procedures provide that Seller retains the right at Auction to reject all bids, including, the bid reflected by this Agreement, subject to the terms of the Bid Procedures. Upon rejection of the bid reflected by this Agreement, the Deposits shall be immediately returned to Purchaser and this Agreement shall be terminated.

## ARTICLE VI
## CLOSING MATTERS

6.1    *Closing.* The closing of the sale and transfer of the Assets (the "**Closing**") will occur within five (5) business days after entry of the Sale Order, which Sale Order shall contain a waiver of any stay pending appeal (the "**Closing Date**"). In the event insurance

8107874-10

underwriting is suspended on the Closing Date and Purchaser is unable to obtain property insurance due to a pending, existing, or past storm, then the Closing Date shall be extended until the fifth (5th) business day after such insurance underwriting suspension is lifted and insurance becomes available. Seller shall have the right to extend the Closing Date by up to ninety (90) days after the date hereof by sending one or more written notice(s) to the Purchaser in order to clear any title issue with respect to any of the Assets; including, without limitation, the title issue raised by that certain Quit Claim Deed recorded in Official Records Book 21675, Page 3341 executed by Rosa Benitez (the "**Quit Claim Deed Issue**"). Any additional extension of the Closing Date shall require the prior written consent of the Seller and the Purchaser (time being of the essence). Purchaser expressly reserves the right to waive the Quit Claim Deed Issue or any other condition to Closing and to require the Seller to close the transaction contemplated by this Agreement within three (3) business days after written notice to the Seller. In the event this Agreement is determined to be a backup bid to an Alternative Offer (as defined in Section 5 of the Bid Procedures) which provides for the purchase of all of the Assets, the Nassau Assets or the Abbaco Assets and such Alternative Offer fails to close and the Assets are available for sale to Purchaser, then, the Closing Date shall occur as specified in the Bid Procedures. The preceding sentence shall be applicable whether the Alternate Offer is on the Nassau Assets, the Abbaco Assets or both. The Closing shall take place in Miami, Florida, at the offices of Seller's counsel, Meland, Russin & Budwick, P.A. or by "mail away" procedure through Seller's counsel as closing agent ("**Closing Agent**"). Berger Singerman LLP, the Purchaser's counsel, shall act as the Title Agent for the Owner's Title Insurance Policy. The Closing will be effective as of 11:59 p.m. prevailing Miami, Florida, time on the Closing Date.

6.2    *Closing Documents and Deliveries.*

(a)    *Seller's Deliveries.* At Closing, Seller shall deliver the following documents duly executed as required:

(i)    Trustee's deed conveying fee simple title to the Real Property, subject only to the Permitted Exceptions and standard exceptions as to matters shown on surveys, municipal liens and parties in possession;

(ii)    one or more bill(s) of sale (in form and substance reasonably satisfactory to each of Seller and Purchaser) conveying to Purchaser the remaining Assets;

(iii)    a Trustee's "Owner's Affidavit" and other instruments reasonably acceptable to the Trustee to the extent reasonably necessary to permit the Title Insurance Company and the Title Agent to satisfy its requirements relative to, and to issue a customary title insurance policy for the Real Property without exception for parties in possession, and any matters caused by Seller falling within the "gap" between the effective date of the title examination and the Closing (but subject to the Permitted Exceptions); provided that the Trustee's Owner's Affidavit, without limitation to other provisions therein, will state that the Trustee has no actual knowledge of, and has not authorized, any construction work on the Assets within 120 days of the Closing;

13

(iv)    a Non-Foreign Affidavit stating that Seller is not a foreign person for purposes of the Internal Revenue Code and any similar document required by Florida law so as to avoid Purchaser's obligation to withhold pursuant to such State's law;

(v)    the Sale Order;

(vi)    a closing statement evidencing the financial aspects of the transaction contemplated in this Agreement; and

(vii)    any other documents specified in this Agreement or required by Title Agent to insure title to the Real Property.

(b)    *Purchaser's Deliveries.* At Closing, Purchaser shall deliver the following items or documents duly executed as required:

(i)    the Purchase Price, after applying or taking into account the Deposit and the Proration Items, to be paid in cash via wire transfer of immediately available funds to an account designated by Closing Agent;

(ii)    incumbency and "bring-down" certificates from the corporate secretary or other authorized representative of Purchaser in a form reasonably satisfactory to Seller;

(iv)    a closing statement evidencing the financial aspects of the transaction contemplated in this Agreement; and

(v)    any other documents specified in this Agreement or required by Title Agent to insure title to the Real Property.

(c)    *Title Insurance Company.* At Closing, the Title Insurance Company shall issue to Purchaser the Owner's Title Insurance Policy at the sole cost of the Purchaser.

6.3    *Conditions to Closing.* The obligations of Seller and Purchaser to consummate the Closing and the transfer of the Assets are subject to the satisfaction of the following conditions:

(a)    the Sale Order (as defined in Section 3 of the Bid Procedures) shall have been entered by the Bankruptcy Court and shall provide for a stay waiver pursuant to Rule 6004 of the Federal Rules of Bankruptcy Procedure;

(b)    no judgment, injunction, order or decree shall have been issued and remain outstanding prohibiting the consummation of the transfer of the Assets or the transactions contemplated under this Agreement;

(c)    (i) the obligation of Seller shall be subject to Purchaser having performed and complied with its obligations and covenants under this Agreement, and the delivery by Purchaser of the closing items and documents to be delivered by Purchaser as set forth above;

8107874-10

and (ii) the obligation of Purchaser shall be subject to Seller having performed and complied with its representations, obligations and covenants under this Agreement, and the delivery by Seller of the closing items and documents to be delivered by Seller as set forth above; and

(d)    At the Closing, the Title Insurance Company, acting through the Title Agent, shall issue to the Purchaser as the named insured a "marked up" title commitment or "pro forma owner's title insurance policy" obligating such Title Insurance Company to issue an owner's title insurance policy insuring fee simple title in and to the Real Property purchased by the Purchaser in the amount of the Purchase Price for such Real Property, subject only to the Permitted Exceptions and standard exceptions for survey matters and matters which would be shown by a current and accurate survey, municipal liens and parties in possession (the "**Owner's Title Insurance Policy**").

## ARTICLE VII
## TERMINATION AND REMEDIES

7.1    *Termination.* Except as expressly provided herein, any termination of this Agreement must be in writing and delivered by the terminating party to the other party. In addition to any causes for termination that may be expressly set forth elsewhere in this Agreement, this Agreement may be terminated as follows:

(a)    *Mutual Consent.* By mutual written consent of both Seller and Purchaser. In such event, Escrow Agent shall promptly return the Deposit to Purchaser and thereafter this Agreement shall be null and void and neither party shall have any further or other obligation to each other.

*(b)*    *Termination Date.* By Purchaser (a) if the Purchaser provides notice of termination of this Agreement prior to the Final Inspection Deadline or (b) if the Closing shall not have occurred by the close of business on (x) no later than the sixty (60) calendar days following any Auction due to the fault of the Seller or (y) continuance of Auction for more than thirty (30) calendar days (the "**Termination Date**"). If Purchaser provides notice of termination of this Agreement prior to the Final Inspection Deadline, it shall serve as a termination of the Agreement as to both the Nassau Assets and the Abbaco Assets.

*(c)*    *Auction; Alternative Offer.* By Seller, in the event that Seller selects an Alternative Offer which is not the Purchaser's offer pursuant to this Agreement, then (i) upon such rejection at Auction or at the time the Alternative Offer actually closes, or (ii) if the Alternative Offer does not close within the time specified in the Bid Procedures and the transaction contemplated in this Agreement is not thereafter closed in accordance with Section 6.1 above and the failure to close this Agreement was not caused by the terminating party, but Seller shall not have this termination right if Purchaser is a Back-Up Bidder (as defined in Section 4 of the Bid Procedures).

*(d)*    In the event of termination pursuant to this Section 7.1(c), Escrow Agent shall promptly return the Deposit to Purchaser, and thereafter this Agreement shall be null and void, and neither party shall have any further or other obligation to the other. Purchaser and Seller acknowledge and agree that in the event this Agreement is determined to be a back-up bid to an Alternative Offer by Seller for all of the Assets, the Nassau Assets or the Abbaco Assets,

then Escrow Agent shall retain the Deposit until such time as is specified in the Bid Procedures. Seller's acceptance of an Alternative Offer shall not limit the Purchaser's indemnity obligations under this Agreement arising or accruing under this Agreement for each of the Nassau Assets and the Abbaco Assets. This section shall apply equally to an Alternative Offer for the Assets, as well as Alternative Offers for the Nassau Assets and the Abbaco Assets, as the case may be. Accordingly, in the event the Seller accepts an Alternative Offer:

      (i)    for the Nassau Assets but not the Abbaco Assets, Seller has the right under this section to terminate this Agreement as to the Nassau Assets and the Purchaser shall remain obligated to close on the Abbaco Assets pursuant to the terms of this Agreement in the amount of the Abbaco Purchase Price.

      (ii)    for the Abbaco Assets but not the Nassau Assets, Seller has the right under this section to terminate this Agreement as to the Abbaco Assets and the Purchaser shall remain obligated to close on the Nassau Assets pursuant to the terms of this Agreement in the amount of the Nassau Purchase Price.

(e)    *Seller's Material Breach.* By Purchaser, so long as Purchaser is not then in an uncured material breach of this Agreement, at any time in the event that Seller is in material breach of its obligations under this Agreement, including but not limited to Seller's failure to close by the Closing Date, and Seller failed to cure such breach to Purchaser's reasonable satisfaction within ten (10) days after Purchaser demands in writing its cure. In such event, Escrow Agent shall promptly return the Deposit to Purchaser, and thereafter this Agreement shall be null and void, and Seller and Purchaser shall not have any further or other obligation to the other. Any claimed breached by Purchaser of Section 2.9(c) herein shall under no circumstances be considered a material breach of this Agreement.

(f)    *Purchaser's Material Breach.* By Seller, so long as Seller is not then in an uncured material breach of this Agreement, at any time in the event Purchaser is in material breach of its obligations under this Agreement, including but not limited to Purchaser's failure to close by the Closing Date, and Purchaser has failed to cure such breach to Seller's reasonable satisfaction within ten (10) days after Seller demands in writing its cure. In such event, Escrow Agent shall promptly deliver the Deposit to Seller, and thereafter this Agreement shall be null and void, and Seller and Purchaser shall not have any further or other obligation to the other. Purchaser agrees that Seller's damages would be uncertain, not readily ascertainable, and difficult or impossible to estimate or determine and that the liquidated damages provided herein are a good faith pre-estimate of the actual damages to be suffered by Seller in such event. Seller and Purchaser agree that in the event of breach pursuant to this section Seller shall be entitled to retain and keep the Deposit as liquidated damages, and not as a penalty, and which liquidated damages shall be in lieu of any other right or remedy of Seller.

(g)    *Offer for Assemblage.* By Seller, in the event that Seller receives from a third party a bona fide offer to purchase the assemblage more particularly described on ***Schedule 2*** attached hereto (the "**Assemblage**") acceptable to the Seller at any time prior to the conclusion of the Auction (at which point the Seller can cancel the Auction and this Agreement shall be deemed terminated).

(h)    *Failure to Satisfy Conditions to Closing.*  By Seller or Purchaser in the event all of the Conditions to Closing set forth in Section 6.3 fail to be satisfied or waived by both Seller and Purchaser on the Closing.

In the event of such termination pursuant to this Section 7.1(b), (g) and (h), then, Escrow Agent shall promptly return the Deposit to Purchaser, and thereafter this Agreement shall be null and void, and neither party shall have any further or other obligation to the other.

<div align="center">

**ARTICLE VIII**
**SURVIVAL MATTERS**

</div>

8.1    *Representations and Warranties.* The several representations and warranties of Seller and Purchaser contained in this Agreement (or in any document delivered in connection with this Agreement) will terminate upon the Closing; provided, however, the respective representations and warranties of Seller and Purchaser contained in Article III and Article IV will survive and expire three (3) months after Closing.

8.2    *Termination Matters.* The respective rights, remedies, and obligations of Purchaser, Seller and Escrow Agent with respect to the Deposit shall survive the termination of this Agreement (in the event Seller rejects all offers at Auction or upon closing of the sale of the Assets pursuant to a third party's Alternative Offer).

<div align="center">

**ARTICLE IX**
**MISCELLANEOUS**

</div>

9.1    *Entire Agreement.* This Agreement, including the Schedules to this Agreement and the documents and agreements to be executed at Closing, constitute the entire agreement of Seller and Purchaser with respect to the subject matter hereof and thereof and supersedes all prior agreements and undertakings, both written and oral, with respect to the subject matter hereof and thereof.

9.2    *Notices.* All notices and other communications delivered pursuant to this Agreement shall be in writing and shall be effective if and when delivered to the parties' addresses listed below by any of the following means: by personal delivery, by any recognized carrier or overnight delivery service, by facsimile or electronic mail, provided a copy is sent the same day by the other methods set forth herein, or by certified United States Mail service, postage prepaid and return receipt requested:

<div style="margin-left: 2em;">

As to Seller:                     Drew M. Dillworth, Trustee
                                 c/o Peter Russin, Esq.
                                 Meland Russin and Budwick, P.A.
                                 200 South Biscayne Blvd., Suite 3200
                                 Miami, Florida 33130
                                 Telephone:    (305) 358-6363
                                 Facsimile:     (305) 358-1221
                                 Email: prussin@melandrussin.com

</div>

<div align="center">17</div>

| As to Purchaser: | B and B Grove Properties LLC |
| | 600 Brickell Avenue, 39th Floor |
| | Miami, FL 33131 |
| | Attn: William L. Mahone |
| | |
| With a copy to: | Corali Lopez-Castro, Esq. |
| | Kozyak Tropin & Throckmorton |
| | 2525 Ponce de Leon Blvd., |
| | Miami, Florida 33134 |
| | |
| With a copy to: | Robert W. Barron, Esq. |
| | Berger Singerman LLP |
| | 350 East Las Olas Boulevard, Suite 1000 |
| | Fort Lauderdale, Florida 33301 |

9.3     *Amendments / Waivers.* Any provision of this Agreement may be amended or waived prior to the Closing Date if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by Seller and Purchaser or, in the case of a waiver, by the party against whom the waiver is to be effective, and such amendment or waiver is approved by the Bankruptcy Court to the extent such approval is required under the Bankruptcy Laws. No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

9.4     *Expenses.* Except as otherwise provided in this Agreement, all costs and expenses incurred in connection with this Agreement shall be paid by the party incurring such cost or expense.

9.5     *Brokers.* The parties represent and warrant to each other that they have not retained a broker, salesman, or finder in connection with this transaction and hold each other harmless relating to same.

9.6     *Risk of Loss.* Seller assumes all risk of loss, damage, destruction or condemnation of the Assets until the Closing has been consummated, and thereafter all such risks are assumed by Purchaser. In the event of any loss, damage, destruction or condemnation before Closing, Seller shall immediately notify Purchaser, and, if such loss, damage, destruction or condemnation equals or exceeds five percent (5%) of the Purchase Price, then Purchaser shall have the right, within five (5) business days after receipt of such notice, and before the Auction, to elect either to (a) terminate this Agreement, or (b) waive such termination right. Seller agrees that, from the Effective Date until the Closing Date, Seller will maintain in full force and effect all risk hazard insurance respecting any part of the Assets which constitutes improved real property so that insurance proceeds will be available, and that Seller will cause such insurance or condemnation proceeds to be turned over to Purchaser at Closing (in which event Seller will already have paid the deductible related to such proceeds), or will assign at Closing (if permitted under its policy) any claim for such loss not yet reduced to proceeds, to compensate for damage or destruction of any part of the Assets acquired by Purchaser. If Seller already has satisfied any deductible or self-insured retention related to such proceeds or claim, there will be no reduction

18

8107874-10

in the Purchase Price. To the extent Seller has not satisfied any such deductible or self-insured retention, Purchaser shall undertake the obligation to pay such costs, and the Purchase Price will be reduced by an amount equal to such costs.

9.7     *Escrow Agent.*

(a)     The payment of the Deposit and all other funds provided hereunder to the Escrow Agent is for the accommodation of the parties to this Agreement. The duties of the Escrow Agent shall be determined solely by the express provisions of this Agreement. In the event Escrow Agent receives a written demand from either Seller or Purchaser for the Deposit (which demand shall include an explanation setting forth the factual basis for such party's request for the Deposit), Escrow Agent shall give ten (10) days written notice to the other party of such demand and of Escrow Agent's intention to remit the Deposit to the party making the demand on the stated date. If Escrow Agent does not receive a written objection within ten (10) days after such notice, Escrow Agent is hereby authorized to so remit the Deposit. If, however, Escrow Agent receives written objection from the other party within ten (10) days after such notice, Escrow Agent shall continue to hold the Deposit until otherwise directed by joint written instructions from Seller and Purchaser, or until a final judgment of an appropriate court is issued. Purchaser and Seller authorize the Escrow Agent, without creating any obligation on the part of the Escrow Agent, in the event this Agreement or the Deposit becomes involved in litigation, to deposit the Deposit with the clerk of the court in which the litigation is pending and thereupon the Escrow Agent shall be fully relieved and discharged of any further responsibility under this Agreement. Purchaser and Seller also authorize the Escrow Agent, if it is threatened with litigation, to interplead all interested parties in any court of competent jurisdiction and to deposit the Deposit with the clerk of the court and thereupon the Escrow Agent shall be fully relieved and discharged of any further responsibility hereunder.

(b)     <u>Liability.</u> The Escrow Agent shall not be liable for any mistake of fact or error of judgment or any acts or omissions of any kind unless caused by its own willful misconduct or gross negligence. The Escrow Agent shall be entitled to rely on any instrument or signature believed by it to be genuine and may assume that any person purporting to give any writing, notice or instruction in connection with this Agreement is duly authorized to do so by the party on whose behalf such writing, notice, or instruction is given.

(c)     <u>Hold Harmless.</u> Purchaser and Seller will, and hereby agree to, jointly and severally, indemnify the Escrow Agent for and hold it harmless against any loss, liability, or expense, including reasonable attorneys' fees and costs, incurred on the part of the Escrow Agent arising out of or in connection with the acceptance of, or the performance of, its duties under this Agreement, as well as the costs and expenses of defending against any claim or liability arising under this Agreement. This provision shall survive the Closing or earlier termination of this Agreement.

(d)     <u>Seller's Attorney.</u> Purchaser acknowledges that the Escrow Agent is also Seller's attorney in this transaction, and Purchaser hereby consents to the Escrow Agent's representation of Seller and Escrow Agent in any litigation which may arise out of or is otherwise related to this Agreement.

9.8     *Successors and Assigns.* The provisions of this Agreement shall be binding upon and inure to the benefit of Seller and Purchaser and their respective successors and assigns. Purchaser shall have the right to assign and transfer its rights or obligations under this Agreement to one or more Purchaser Affiliates without having to obtain any consent of Seller. As used herein, **"Purchaser Affiliates"** as to any Person shall mean a Person under common ownership and control with such Person.

9.9     *Certain Interpretive Matters.* Titles and headings to Sections in this Agreement are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement. No provision of this Agreement will be interpreted in favor of, or against, Seller or Purchaser by reason of the extent to which either Seller or Purchaser or its counsel participated in the drafting thereof or by reason of the extent to which any such provision is inconsistent with any prior draft hereof or thereof. The Recitals to this Agreement are true and correct and are hereby incorporated into this Agreement for all purposes.

9.10  *Governing Law and Jurisdiction.* This Agreement shall be construed in accordance with and governed by the laws of the State of Florida regardless of the laws that might otherwise govern under principles of conflict of laws applicable hereto. This Agreement is also subject to any applicable order or act of the Bankruptcy Court. In the event of a dispute hereunder not governed by any specific resolution process in this Agreement, such dispute shall be brought exclusively in the Bankruptcy Court which shall retain exclusive jurisdiction with respect to the interpretation, performance, and enforcement of this Agreement.

9.11  *Counterparts; Effectiveness.* This Agreement may be executed in two or more counterparts (including by means of facsimile signature pages or actual imaged signatures transmitted electronically), all of which shall be considered one and the same agreement.

9.12  *Severability.* If any term, provision, covenant or restriction of this Agreement is determined to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement will remain in full force and effect and will in no way be affected, impaired, or invalidated.

9.13  *Time.* Time is of the essence in this Agreement with regard to all acts and dates imposed on Seller and Purchaser. All time periods and deadlines set forth in this Agreement shall be calculated in calendar days, unless business days are expressly stated. In the event that the date upon which any duties or obligations hereunder are to be performed, or the exercise of any option or right or any deadline hereunder shall occur or be required to occur, shall be a Saturday, Sunday or holiday on which banks in the State of Florida are closed, then, in such event, the due date for performance of any duty or obligation or the exercise of any option or right shall thereupon be automatically extended to the next succeeding business day. All deadlines and time periods shall be deemed to expire or occur, as applicable, at 5:00 p.m. Eastern prevailing time unless otherwise expressly stated herein.

9.14  *Attorneys' Fees.* If there is any legal action or proceeding between Seller and Purchaser to enforce or interpret any provisions of this Agreement or to protect or establish any right or remedy of any of them hereunder, the unsuccessful party to such action or proceeding shall pay to the prevailing party all costs and expenses (including, but not limited to, reasonable

8107874-10

attorneys' fees and costs) incurred by such prevailing party in such action or proceeding. If either Seller or Purchaser secures a judgment in any such action or proceeding, then any costs and expenses (including, but not limited to reasonable attorneys' fees and costs) incurred by the prevailing party in enforcing such judgment, or any costs and expenses (including, but not limited to reasonable attorneys' fees and costs) incurred by the prevailing party in any appeal from such judgment in connection with such appeal shall be recoverable separately from and in addition to any other amount included in such judgment. The preceding sentence is intended to be severable from the other provisions of this Agreement, and shall survive and shall not be merged into any such judgment.

9.15 *Radon Gas.* Section 404.056, Florida Statutes, requires the following notice to be provided with respect to the contract for sale and purchase of any building:

> RADON GAS: Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit.

9.16 *WAIVER OF JURY TRIAL.* SELLER AND PURCHASER HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER ARISING IN TORT OR CONTRACT) BROUGHT BY EITHER AGAINST THE OTHER ON ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT.

[*signatures on the following page*]

This Asset Purchase Agreement is executed and agreed as of the date set forth above.

SELLER:

By:

DREW M. DILLWORTH, not individually but as Chapter 11 bankruptcy trustee for (i) NASSAU DEVELOPMENT OF VILLAGE WEST, CORP., a Florida corporation and (ii) GRAND ABBACO DEVELOPMENT OF VILLAGE WEST CORPORATION, a Florida corporation

**PURCHASER:**

B AND B GROVE PROPERTIES LLC, a Delaware limited liability company

By:_____

Name:_____

Title:_____

22

This Asset Purchase Agreement is executed and agreed as of the date set forth above.

**SELLER:**

By:_____

DREW M. DILLWORTH, not individually but as
Chapter 11 bankruptcy trustee for (i) NASSAU
DEVELOPMENT OF VILLAGE WEST, CORP.,
a Florida corporation and (ii) GRAND ABBACO
DEVELOPMENT      OF      VILLAGE      WEST
CORPORATION, a Florida corporation

**PURCHASER:**

B AND B GROVE PROPERTIES LLC, a Delaware
limited liability company

By:_____
Name:_ WILLIAM R. BERKLEY _
Title:_ MANAGER _

22

## SCHEDULE 1.1

## NASSAU REAL PROPERTY

## SCHEDULE 1.1
## Nassau Real Property

**3441 Grand Avenue, Miami, Florida 33133**

Lots 17 and 18, Less the South 10 feet thereof, Block 23 of AMENDED PLAT OF THE FROW HOMESTEAD, according to the Plat thereof as recorded in Plat Book B, Page 106, of the Public Records of Miami-Dade County, Florida.

**3461 Grand Avenue, Miami, Florida 33133**

Lots 15 and 16, Less the South 10 feet thereof, Block 23 of AMENDED PLAT OF THE FROW HOMESTEAD, according to the Plat thereof as recorded in Plat Book B, Page 106, of the Public Records of Miami-Dade County, Florida.

**3412 Florida Avenue, Miami, Florida 33133**

Lot 2, Block 23, of AMENDED PLAT OF THE FROW HOMESTEAD, according to the Plat thereof as recorded in Plat Book B, Page 106, of the Public Records of Miami-Dade County, Florida.

**3400 Florida Avenue, Miami, Florida 33133**

Lot 1, Block 23, of AMENDED PLAT OF THE FROW HOMESTEAD, according to the Plat thereof as recorded in Plat Book B, Page 106, of the Public Records of Miami-Dade County, Florida.

## SCHEDULE 1.2

## ABBACO REAL PROPERTY

**SCHEDULE 1.2**
*Grand Abbaco Real Property*

**3364 Grand Avenue, Miami, Florida 33133**

Lots 17 and 18, Less the North 10 feet thereof, Block 28, of AMENDED PLAT OF THE FROW HOMESTEAD, according to the Plat thereof as recorded in Plat Book B, Page 106, of the Public Records of Miami-Dade County, Florida.

**3384 Grand Avenue, Miami, Florida 33133**

Lot 19, Less the North 10 feet thereof, and the East ½ of Lot 20, less the North 10 feet thereof, Block 28, of AMENDED PLAT OF THE FROW HOMESTEAD, according to the Plat thereof as recorded in Plat Book B, Page 106, of the Public Records of Miami-Dade County, Florida.

# SCHEDULE 2

# THE ASSEMBLAGE

**SCHEDULE 2**
*Assemblage*

All real property owned in the Grand Avenue corridor by the following affiliates of the Nassau Debtor and Abbaco Debtor:

Paradise Island Development Corporation
West Grove Development Corporation
Freeport Development of Village West Corporation
Grand Abbaco Development II Corp.
3354 Grand, Inc.
Andros Development Corporation
Grand Bahamas Development of Village West Corporation
Jarrette Bay Investments Corporation
CG 3415 Grand, LLC
Bimini Development of Village West Corporation

**SCHEDULE 3.3**

**LIST OF ORAL LEASE**

| Collection Period: | May-17 |
| --- | --- |

| Address: | 3384 GRAND AVE |
| --- | --- |
| Units: | 1 |
| Vacant: | 0 |
| Occupancy | 100.00% |

| Development: | GRAND ABBACO |
| --- | --- |
| OPEX: | |
| Total Collections: | $ - |

| Date | Receipt No. | BUILDING UNIT | TENANT NAME | Disposition Accrual | New Tenant (Y/N) | Deposit | New Tenant (First Month) | Previous Balance Due | Current Rent Due | Other Fees / Eviction Fees | Total Due | Amount Paid | Remaining Balance | PM Notes ($50) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | | 61,000.00 | 6,000.00 | - | 67,000.00 | - | 67,000.00 | |

| Collection Period: | May-17 |
| --- | --- |
| Address: | 3400 GRAND AVE |
| Units: | 2 |
| Vacants: | 0 |
| Occupancy: | 100.00% |

| Development: | NASSAU-3400 |
| --- | --- |
| GPDS: | |
| Total Collections: | $ - |

Click here to return to the Correct Month's Receipts Tab

Click here to return to the Summary Tab

| Date | Receipt No. | BUILDING-UNIT | TENANT NAME | Deposit on Account | New Tenant LTOL Balance | New Tenant Deposit | New Tenant (Rent Owed) | Previous Balance Owed | Current Rent Due | Other Fees / Eviction Fees | Total Due | Amount Paid | Remaining Balance | RM Notes (SILP) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 3400-1 | DAREN TRIMAINE EVERETT | | | | | 12,200.00 | 800.00 | - | 13,000.00 | - | 13,000.00 | |
| | | 3400-2 | | | | | | 2,480.00 | 800.00 | - | 2,680.00 | - | 2,680.00 | |
| | | | | | | | | 14,680.00 | 1,600.00 | - | 15,680.00 | - | 15,680.00 | |

| Collection Period: | May-17 |
| --- | --- |

Click here to return to the Current Month's Receipts Tab

Click here to return to the Summary Tab

| Development: | NASSAU-3412 |
| --- | --- |
| Units: | |
| Total Collections: | $ - |

| Address: | 3412 GRAND AVE |
| --- | --- |
| Units: | 2 |
| Vacant: | 2 |
| Occupancy: | 0.00% |

| Date | Receipt No. | BUILDING-UNIT | TENANT NAME | Deposit on Account | New Tenant (Y/N) | Deposit | New Tenant (First Month) | Previous Balance Due | Current Rent Due | Other Fees / Eviction Items | Total Due | Amount Paid | Remaining Balance | PM Notes (EM) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 3412-1 | VACANT | | | | | | | | | | | |
| | | 3412-2 | VACANT | | | | | | | | | | | |

Click here to return to the Current Month's Receipts Tab

Click here to return to the Summary Tab

| Collection Period: | May-17 |
| --- | --- |
| Address: | 3441 GRAND AVE |
| Units: | 12 |
| Vacant: | 7 |
| Occupancy: | 41.67% |

| Development: | NASSAU-3441 |
| --- | --- |
| GPDC | |
| Total Collections: | $ - |

| Date | Receipt No. | BUILDING-UNIT | TENANT NAME | Deposit are Account | New Tenant (Y/N) | Deposit | New Tenant (First) Rent Arrival | Previous Balance | Current Rent Due | Other Fees / Evictions Due | Total Due | Amount Paid | Remaining Balance | COA Move (YTD) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 3441-1 | VACANT | | | | | | - | | - | | | |
| | | 3441-2 | JUDY MONER    RENT FREE | | | | | | - | | - | | | |
| | | 3441-3 | VACANT | | | | | | - | | - | | | |
| | | 3441-4 | VACANT | | | | | | - | | - | | | |
| | | 3441-5 | VACANT | | | | | | - | | - | | | |
| | | 3441-6 | VACANT | | | | | | - | | - | | | |
| | | 3441-7 | VACANT | | | | | | - | | - | | | |
| | | 3441-8 | LATRICIA KAMITHA MCLEAN | | | | | 1,650.00 | 600.00 | | 2,490.00 | 2,490.00 | - | |
| | | 3441-9 | | | | | | 3,000.00 | | | 3,000.00 | 3,000.00 | - | |
| | | 3441-10 | VACANT | | | | | | - | | - | | | |
| | | 3441-11 | VACANT | | | | | | - | | - | | | |
| | | 3441-12 | VACANT | | | | | | - | | - | | | |

| | | | | | | | | 13,730.00 | 2,950.00 | | 16,680.00 | 16,680.00 | | |

**EXHIBIT B**

**LISTED LIENS AND ENCUMBRANCES**

**LISTED LIENS AND ENCUMBRANCES**

1.  Mortgage and Security Agreement from Nassau Development of Village West Corp., a Florida corporation to BankUnited, FSB dated June 29, 2004, recorded July 7, 2004 and recorded in Official Records Book 22457, Page 4734, of the Public Records of Miami-Dade County, Florida.

2.  Mortgage, Assignment of Leases and Rents and Security Agreement from Nassau Development of Village West Corp., a Florida corporation, and Paradise Island Development Corporation, a Florida corporation, and CG 3415 Grand, LLC, a Florida limited liability company, and Andros Development Corporation, a Florida corporation to Orlando Benitez, Jr. dated March 20, 2010, recorded March 25, 2010 and recorded in Official Records Book 27228, Page 1910, as modified by the Mortgage Modification Agreement recorded in Official Records Book 29247, Page 1018; and together with Termination of the UCC-1 Financing Statement(s) recorded in Official Records Book 27300, Page 1895, and Official Records Book 27300, Page 1940, and Official Records Book 27300, Page 1919, and Official Records Book 27698, Page 4015, of the Public Records of Miami-Dade County, Florida.

3.  Mortgage from Nassau Development of Village West Corp., a Florida corporation to BankUnited, FSB dated September 7, 2004, recorded September 22, 2004 and recorded in Official Records Book 22673, Page 850, as assigned to BankUnited, N.A. by the Assignment recorded in Official Records Book 29404, Page 828, and subsequently assigned to Pretium Mortgage Credit Partners I Loan Acquisition, LP by the Assignment of Mortgage recorded in Official Records Book 29405, Page 4991, and subsequently assigned to Wilmington Savings Fund Society, d/b/a Christiana Trust, not individually but as Trustee for Pretium Mortgage Acquisition Trust by the Assignment of Mortgage recorded in Official Records Book 29407, Page 4259, of the Public Records of Miami-Dade County, Florida.

4.  Balloon Mortgage and Security Agreement from Nassau Development of Village West Corporation, a Florida corporation to Placido Diaz dated January 15, 2004, recorded February 19, 2004 and recorded in Official Records Book 22057, Page 2727, and as assigned to Alicia Diaz, as Trustee by the Assignment of Mortgage recorded in Official Records Book 25999, Page 3553, and as modified by the Mortgage Modification Agreement recorded in Official Records Book 22083, Page 3436, and as affected by the Subordination Agreements recorded in Official Records Book 22586, Page 1289 and Official Records Book 22873, Page 4237, of the Public Records of Miami-Dade County, Florida.

5.  Balloon Mortgage and Security Agreement from Julio C. Marrero, Placido Diaz, Orlando Benitez, and Muskat Brothers, Inc. to Vernon Belle Garraway dated July 30, 2003, recorded September 23, 2003 and recorded in Official Records Book 21675, Page 3342, and as assigned to Vernon Belle Garraway as Trustee under agreement dated September 2, 1994 by Assignment of Mortgage recorded in Official Records Book 22150, Page 203, and

1

subsequently assigned to DD&C Financial Investments Corporation by Assignment of Mortgage and Other Loan Documents recorded in Official Records Book 28896, Page 3189, and as modified by the Mortgage Modification and Ratification Agreement recorded in Official Records Book 22873, Page 4230, and as affected by the Cross-Default and Cross-Collateralization Agreement recorded in Official Records Book 27603, Page 1518, of the Public Records of Miami-Dade County, Florida.

6.  Mortgage and Security Agreement from Grand Abbaco Development of Village West Corporation, a Florida corporation to Bank United, FSB dated March 8, 2004, recorded March 9, 2004 and recorded in Official Records Book 22108, Page 1432, as assigned to Orlando Benitez, Sr. by Assignment of Mortgage recorded in Official Records Book 26991, Page 4890, and as subsequently assigned to Orlando Benitez, Jr. by the Assignment of Mortgage recorded in Official Records Book 27815, Page 3144, together with by Assignment of Leases, Rents and Profits recorded in Official Records Book 22108, Page 1442, of the Public Records of Miami-Dade County, Florida.

7.  Lis Pendens filed by Orlando Benitez, Jr., et-al under Case No. 2016-018732-CA-01, recorded in Official Records Book 30169, Page 2114, together with and as affected by the Amended Notice of Lis Pendens recorded in Official Records Book 30203, Page 2112, of the Public Records of Miami-Dade County, Florida.

8.  Lis Pendens recorded in Official Records Book 27814, Page 4475 in that certain Case No. 11-27155-CA-05, and vacation of Final Judgment of Foreclosure recorded in Official Records Book 28560, Page 3964, as affected by the Orders recorded in Official Records Book 28776, Page 169; Official Records Book 29169, Page 1924; Official Records Book 29658, Page 340; Official Records Book 29658, Page 3456; Official Records Book 29693, Page 1531; Official Records Book 29767, Page 2720; Official Records Book 29769, Page 735, and Official Records Book 29803, Page 294, of the Public Records of Miami-Dade County, Florida.

9.  Lis Pendens filed by Alicia Diaz under Case No. 09-16170-CA-10, recorded in Official Records Book 26775, Page 3744, and Official Records Book 26775, Page 3746, as affected by Notices and Orders recorded in Official Records Book 26856, Page 1946; Official Records Book 26868, Page 1626 and Official Records Book 27813, Page 3404, of the Public Records of Miami-Dade County, Florida.

10. Lis Pendens filed by DD&C Financial Investments Corporation under Case No. 14-014917-CA-01 recorded in Official Records Book 29187, Page 833, of the Public Records of Miami-Dade County, Florida.

11. Lis Pendens filed by Orlando Benitez, Jr., under Case No. 14-014931-CA-01 recorded in Official Records Book 29187, Page 1164, of the Public Records of Miami-Dade County, Florida.

12. Final Judgment against Nassau Development of Village West Corp., under Case No. 10-6802-CA-01, as recorded in Official Records Book 29107, Page 4828, as amended by the Amendments of Final Judgment recorded in Official Records Book 29199, Page 1265, Official

Records Book 29205, Page 901, Official Records Book 29213, Page 686, and Official Records Book 29218, Page 4381, and as affected by the Orders recorded in Official Records Book 29308, Page 2892, and Official Records Book 28940, Page 1186, of the Public Records of Miami-Dade County, Florida.

13. Judgments and Liens against Rosa Benitez; recorded in Official Records Book 27988, Page 2436; and Official Records Book 29368, Page 4363, of the Public Records of Miami-Dade County, Florida.

<p align="center">* * * * * *</p>